James D. HODGSON, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

VETERANS CLEANING SERVICE,
INC., et al., Defendants.

Civ. A. No. 72–196–Civ–J.

United States District Court,
M. D. Florida,
Jacksonville Division.

Sept. 18, 1972.

Richard F. Schubert, Solicitor of Labor, U. S. Dept. of Labor, Washington, D. C., and Beverley R. Worrell, Regional Solicitor, and Anthony B. Cuviello, Atty., Atlanta, Ga., for plaintiff.

Jere D. McWinn, Jacksonville, Fla., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHARLES R. SCOTT, District Judge.

This cause came on for trial before this Court sitting without a jury on July 12 and 13, 1972. The Court, having considered the pleadings; pre-trial stipulation of the parties; stipulations made at trial; oral testimony; exhibits; and briefs of counsel, makes the following findings of fact and conclusions of law.

## STATEMENT OF THE CASE

This action was brought by the Secretary of Labor under and pursuant to the provisions of the Fair Labor Standards Act of 1938, as amended [29 U.S.C. § 201 et seq.], hereinafter referred to as "the Act," seeking to have the defendants, and each of them, enjoined from violating the minimum wage and overtime provisions of the Act, and restrained from continuing to withhold payment of minimum wages and overtime compensation that may be found by the Court to be due certain of defendants' employees.

Defendants' defenses consist of a denial that they or their employees are covered under the Act's provisions; that even if so covered, their employees are exempt from application of such provisions by virtue of § 13(a)(2) of the Act [29 U.S.C. § 213(a)(2)]; that this action is completedly barred under § 10 of the Portal-to-Portal Act [29 U.S.C. § 259] and that recovery of back wages is limited to two years by § 6 of said Portal-to-Portal Act [29 U.S.C. § 255].

Let us immediately proceed to the question of "coverage" under the Act. Plaintiff contends that the defendants, Veterans Cleaning Service, Inc. ("Veterans Cleaning"), Rent-A-Maid, Inc. ("Rent-A-Maid"), Roto Rooter Sewer Service of Duval County, Inc. ("Roto Rooter") and Bernard Ettlinger ("Ettlinger") constitute an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the Act, therefore all of their employees are covered by and subject to the minimum wage and overtime provisions of §§ 6 and 7 of the Act [29 U.S.C. §§ 206 and 207].

§ 3(r) of the Act [29 U.S.C. § 203(r)] defines the term "Enterprise," in part, as follows:

" 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements . . . ."

§ 3(s) of the Act [29 U.S.C. § 203(s)] defines "Enterprise engaged in commerce or in the production of goods for commerce" to mean, in part:

" . . . an enterprise [as defined in § 3(r)] which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

(1) . . . beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than

$250,000 (exclusive of excise taxes at the retail level which are separately stated) ; ''

## FINDINGS OF FACT

1. Considering the definition of "Enterprise" in § 3(r) above, it is clear that each and all of the four named defendants' activities are performed both through unified operation and common control.

At all times pertinent to these proceedings, defendant Ettlinger, a resident of Jacksonville, Florida, was owner and president of Veterans Cleaning and Roto Rooter. (T. 18–19.) He was secretary of Rent-A-Maid, which is in his son's name. (T. 19.) Defendant Ettlinger testified however that he is the operating manager of all three of the corporate defendants (T. 20); that he is responsible for the time and payroll records for each of the companies (T. 25) and that he personally signs all payroll checks of each of the companies. (T. 26).

The corporate defendants are all housed in common facilities described by defendant Ettlinger as "a concrete block building with approximately 5,000 feet of office and storage space inside and approximately the same amount of parking facilities outside" (T. 21), located at 2805 Phillips Highway [Kings Avenue], Jacksonville, Florida.

All supplies, material and equipment used by and for defendants' activities are stored and maintained in a common storage area in defendants' common offices. Maintenance, and repair activities on automotive equipment (trucks) of defendants are performed in and at a common service area behind defendants' building, by a common employee. (T. 20–21.)

All central office functions, such as bookkeeping, payroll, billing, ordering, etc. are performed from common offices by common employees. Mrs. Mary Jayne Smith is the office manager and the bookkeeper for all three companies. (T. 25, 61.) She supervises and oversees the work of Richard Johns who is the payroll clerk (time and payroll) for all three companies (T. 62). Mrs. Smith receives and deposits in the bank the monies collected by all three companies (T. 69–70). Defendant Ettlinger's wife is the invoice and billing clerk for Roto Rooter but occasionally helps out with Veterans Cleaning matters. (T. 71.)

It is unquestionable that all of defendants' activities performed from and out of this single establishment, constitute a unified family operation which is consolidated under the fiduciary and physical ownership, control and active management of defendant Ettlinger.

2. As to the question of whether defendants' activities are "related activities performed . . . for common a business purpose" within the meaning of § 3(r), there can be little, if any, serious doubt.

*Veterans Cleaning* is an industrial-commercial janitorial, window washing and maintenance firm. While its services are provided primarily on a contract basis for and in offices and places of business, it does, on occasion perform such services in and at private residences. (T. 37, 81, 92, 179.) Such services consist of dusting, sweeping and waxing floors, cleaning restrooms, vacuuming and shampooing rugs, shampooing furniture, taking out trash, etc. (T. 37, 84, 180.) Employees are transported to and from their particular jobs, along with all necessary equipment and supplies, in trucks belonging to Veterans Cleaning. (T. 24, 180.)

*Rent-A-Maid* furnishes maids, primarily to private residents, for one, two or more days on a "customer-need" basis. The company furnishes merely a maid in uniform. All cleaning equipment, supplies and materials are furnished by the individual householder (T. 37, 180). The maids are transported to and from their particular jobs in trucks belonging to Veterans Cleaning or in the private automobiles of defendant Ettlinger or his son. (T. 22, 24, 37.)

*Roto Rooter* is a sewer and septic tank cleaning and maintenance service. This service is provided to customers who call in to have their sewers, sinks, commodes, tubs, floor drains or septic tanks (including drain fields) unclogged, cleaned and maintained. (T. 37–40, 181.) Employees and equipment are transported to and from the particular job in trucks belonging to Roto Rooter. (T. 24.)

Each of the defendant companies: Veterans Cleaning, Rent-A-Maid and Roto Rooter is engaged in and provides cleaning and/or maintenance services. The record clearly establishes that the defendants consider themselves as being engaged in "related activities performed . . . for a common business purpose."

Employee witnesses testified that they regularly interchanged employment among the companies. (T. 73–80; 80–96; 97–101; 104–107.)

Defendant Ettlinger testified that he would characterize all the businesses conducted out of his office as: "We're in the service business." (T. 213); " . . . I'm just in the service industry." (T. 214.)

Exhibit P–6 is the original of a letter dated February 2, 1965, from the defendants to the plaintiff's representatives. The letterhead shows the manner in which the defendants considered and characterized themselves in 1965. Defendants' Exhibit C consists of samples of various letterheads currently in use by the defendants, including a general letterhead similar to Exhibit P–6.

Each of these samples of letterhead carry in large bold printing at the top, the words, "VETERANS CLEANING SERVICE." Immediately under these words in print, while not as large but equally prominent, are the words "General Cleaning Contractors." Running from these latter words is a bold line which points directly to a list of the various services provided by this self-proclaimed "General Cleaning Contractor." As seen on defendants' Exhibit C, the current list includes: Veterans Janitor Service, Veterans Window Cleaning Service, Roto-Rooter Septic Tank Pumping Service, Roto-Rooter Sewer Service, Venetian Blind Laundry, and Rent-A-Maid. The older letterhead (Exh. P–6) also listed Host Dry Carpet Cleaning (T. 216–227).

Exhibit P–7, the original of a monthly statement sent by defendants to a contract cleaning customer, likewise lists in its heading all of the aforesaid services (T. 226–227).

It is obvious that defendants intended to and did promote a consolidated and integrated maintenance, or "general cleaning service" complex under the style of "Veterans Cleaning Service." True, this total service program included several different types of cleaning or maintenance activities, but each one, nonetheless, is a cleaning and/or maintenance activity. This was and is the defendants' "common business purpose."

3. Defendants regularly ordered, purchased and received supplies and equipment from several points outside the State of Florida, which supplies and equipment regularly were used or handled by defendants' employees. (T. 29, 31, 41, 42, 46–48.)

4. Defendants had annual (calendar year) gross volume of sales, as follows:

|  | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|
| Veterans Cleaning | $265,636.38 | $293,337.98 | $241,609.16 | $208,612.26 |
| Rent-A-Maid |  | 12,468.05 | 16,516.20 | 9,793.10 |
| Roto Rooter | 109,230.77 | 156,433.50 | 230,187.46 | 310,758.59 |
| Totals | —$374,867.15 | $462,239.53 | $488,312.82 | $529,163.95 |

351 F.Supp.—47½

5. Having found all of the elements necessary to find defendants' employees covered under the Act, let us now turn to the defenses raised by the defendants.

(a) The exemption afforded by § 13(a)(2) of the Act [29 U.S.C. § 213(a)(2)] is claimed as to all of defendants' employees. This section provides, in part, that the minimum wage and overtime provisions of the Act shall not apply to "any employee employed by any retail or service establishment . . ., if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services if made within the State in which the establishment is located, *and* such establishment is not in an enterprise described in section 3(s), *or* such establishment has an annual dollar volume of sales which is less than $250,000 . . .." (Emphasis added.)

■ It is clear that this exemption is not available to the defendants since their sole establishment is a § 3(s) enterprise and such establishment has annual gross sales of in excess of $250,000.

■ (b) Defendants' second defense is that this entire action is barred under the provisions of § 10 of the Portal-to-Portal Act [29 U.S.C. § 259]. Said § 10 provides that an employer is not subject to any liability or punishment for failure to pay minimum wages or overtime compensation under the Act if he pleads and proves that the act or omission complained of was in *good faith* in conformity with and in *reliance* on any *written* administrative regulation, order, ruling, approval, or interpretation of the Department of Labor, or any administrative practice or enforcement policy of the Department with respect to the class of employers to which he belonged.

The basis for defendants' reliance upon this defense is not apparent to the Court. No showing whatsoever has been made of the existence of any *written* or other administrative regulation, order, ruling, approval of interpretation of the Department upon which the defendants relied in connection with their pay prac-

tices. Nor, has there been any showing of any administrative practice or enforcement policy of the Department upon which the defendants might have relied. Obviously, this defense is not available to the defendants.

(c) Defendants' final defense raises the question of whether the 2 or the 3-year Statute of Limitations found in § 6 of the Portal-to-Portal Act [29 U.S.C. § 255] is applicable to the circumstances here. Said section provides in part:

"Sec. 6. Statute of limitations.—Any action . . . to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation . . . under the [Act] . . .—

(a) . . . may be commenced within *two* years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, *except* that a cause of action arising out of a *willful* violation may be commenced within *three* years after the cause of action accrued." (emphasis added.)

The term "willful," as used in this context, was clearly defined by the Fifth Circuit in Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139 (CA 5–1971), Rehearing denied May 17, 1972. In affirming the District Court's finding of willfulness the Court ruled:

"The entire legislative history of the 1966 amendments of the FLSA indicates a liberalizing intention on the part of Congress. Requiring employer to have more than awareness of the possible applicability of the FLSA would be inconsistent with that intent. Consequently, we hold that employer's decision to change his employees' rate of pay in violation of FLSA is 'wilful' *when,* as in this case, *there is substantial evidence in the record to support a finding that the employer knew or suspected that his actions might violate the FLSA.* Stated most simply, we think the test should be: *Did the employer know the FLSA was in the picture?" Id.* at 1142. (emphasis added.)

In these circumstances it cannot seriously be doubted that the defendants' failures to pay statutory minimum wages and overtime compensation to their employees were willful. Defendant Ettlinger admitted that he did not pay employees statutory minimum wages and overtime compensation. (T. 50–57, 204–206, 228–236.) Defendants' time and payroll records demonstrate that such was the case (Exhibits P–2, 3 and 4). The defendants' "history" of investigations under and violations of the Act certainly demonstrate that they had more than a suspicion that "the Act was in the picture."

Considering that "history" (Exhibit P–1; T. 109–140, 142–143), it readily is apparent that there can be no question of the defendants' knowledge of and familiarity with the Act. In summary, six investigations have been made under the Act of the defendants' activities since 1958. In each case the Wage and Hour Division Compliance Officer making the investigation dealt with defendant Ettlinger as the official of whichever companies were operating at that particular time.

In the *first* investigation in December 1958, violations of the minimum wage, overtime and recordkeeping provisions of the Act were found and substantial back wages were computed, which defendant Ettlinger agreed to pay. In the *second* investigation in February 1963, violations of the minimum wage, overtime and recordkeeping provisions were found and substantial back wages were computed, which defendant Ettlinger agreed to pay. In the *third* investigation in October 1964, violations of the minimum wage, overtime and recordkeeping provisions were again found and substantial back wages were computed, which defendant Ettlinger refused to pay. In the *fourth* investigation, a special investigation, in August 1966, minimum wage and overtime violations were found with respect to three handicapped workers, one of which defendant Ettlinger paid and the other two of which he refused to pay. In the *fifth* investigation in October 1966, violations of the minimum wage, overtime and recordkeeping provisions were again found and substantial back wages were computed, which defendant Ettlinger again refused to pay. In the *sixth* investigation in April 1971, minimum wage and overtime violations were again found and substantial back wages were computed. This sixth investigation apparently prompted this suit by the Secretary of Labor.

In addition to specifically discussing the results of these several investigations with defendant Ettlinger, Wage and Hour Assistant Area Director Harold Glenn and Compliance Officer Emerson Goodale both had occasions to discuss impending changes in coverage under the Act with defendant Ettlinger. They advised him prior to the February 1, 1969, change in § 3(s) enterprise coverage that on and after said date the dollar volume test would drop from $500,000 to $250,000 per year. Obviously defendant Ettlinger chose to ignore such advice.

It is clear that the defendants' actions were "willful" in that they were deliberate, voluntary and intentional as distinguished from accidental or inadvertent. Coleman v. Jiffy June Farms, Inc., *Id.* at 1142.

6. All of defendants' defenses having failed, we turn now to the question of violation of the minimum wage and overtime provisions of the Act and the resultant unpaid wages due defendants' employees. The parties agreed that defendants' time and pay records accurately reflect the daily and weekly hours worked by employees and the total compensation paid to such employees, and that the back wages due defendants' employees can be computed directly from such records. The parties agreed further that the Wage Transcription and Computation Sheets (Exhibits P–2, 3 and 4) accurately reflect the amount of such unpaid minimum wages and overtime compensation due defendants' employees for the period prior to January 14, 1971. (Pre-trial Stipulation ¶¶ 6

(e), (f) and (g)), with the exception of alleged illegal deductions. These exhibits show clearly that defendants' employees were not paid minimum wage rates of $1.30 an hour during the period from February 1, 1969, to January 31, 1970; $1.45 an hour from February 1, 1970, to January 31, 1971, and $1.60 thereafter. They also clearly show that employees were paid at straight time regular rates for all hours worked over forty hours in workweeks.

As to any unpaid minimum wages and/or overtime compensation that might be due defendants' employees for the period subsequent to January 14, 1971, to the present, the parties have agreed that defendants' time and pay records would be produced and such back wages, if any, would be computed directly from such records. (T. 14–16, 64–66, 275.)

7. The alleged illegal deductions question apparently applies to only two employees of Veterans Cleaning, Austin Croy (Ex. P–2, Sheet A–82) and Amos Jones (Ex. P–2, Sheets A–94 and 95). Defendant Ettlinger testified that he regularly deducted from employees' pay for draws within a week against that week's earnings, loans, alleged damage to defendants' vehicles, police fines, etc. (T. 53–56.) Ettlinger admitted that whether or not the deductions dropped the particular employee below minimum wage for that week was of no concern to him (T. 56–57, 205). In connection with certain deductions from the wages of employee Austin Croy (Ex. P–2, Sheet A–82) there was testimony that this employee had failed to perform some janitorial work for a customer because he previously had been beaten up and feared to go back. (T. 154–155.) The defendants thereupon deducted the full amount the defendants charged the customer from the wages of this employee, *in the nature of a penalty*. This was admitted by defendant Ettlinger (T. 229–235) who testified that he deducted the full month's bill from the wages of employee Croy even though the amount of the customer's bill constituted only a portion of the employee's workday or workweek. The record contains no evidence of the number of hours or amounts of wages such unperformed work might have involved.

As to employee Amos Jones (Ex. P–2, Sheets A–94 and 95) defendant Ettlinger admitted that he deducted from this employee's wages each week for alleged damage to a truck regardless of whether such deductions caused his wages to fall below statutory minimum wages. (T. 56–57.)

The Court notes that in the case of employee Croy, defendants deducted a total of $531.00 during the period from April 1, 1970, through October 21, 1970; and in the case of employee Jones, defendants deducted a total of $1,661.60 during the period from February 5, 1969, through February 11, 1970. There is no other evidence in the record to identify the many deductions taken from the wages of these two employees. Apparently the defendants' records carried all deductions under the heading "miscellaneous deductions" with no further identification. (T. 146–153.) Since there is no identification or segregation on defendants' records distinguishing what might be valid deductions, such as payroll advances made within a workweek, from improper deductions, such as for truck repairs, police fines and failure to perform penalties that reduced wages below statutory minimums, *all deductions* must be treated as improper in instances when they caused weekly wages to fall below statutory minimum wages or overtime rates.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties to and the subject matter of this action.

2. Defendant Bernard Ettlinger, as the principal owner and managing executive acting directly and indirectly in the interests of the three defendant corporations in relation to their employees, is an employer within the meaning of § 3(d) of the Act [29 U.S.C.

§ 203(d)], as are each of the corporations.

3. The business activities of defendants Veterans Cleaning, Rent-A-Maid and Roto Rooter, although technically different, reasonably must be considered to be related activities in that each provides a service in the general cleaning and maintenance industry.

The Department of Labor's Interpretative Bulletin No. 779 (Exhibit P–5), [29 CFR 779], states clearly:

"§ 779.207 RELATED ACTIVITIES IN RETAIL OPERATIONS.

"In the case of an enterprise which has one or more retail or service establishments, all of the activities which are performed for the furtherance of the common business purpose of operating the retail or service establishments are 'related activities.' It is not material that the enterprise sells different goods or provides different services . . ."

The Court has considered several cases dealing with this question. I am not convinced by the language in any of such cases, none of which offer any factual assistance, that the defendants' various businesses are not related. I cannot ignore the fact that defendant Ettlinger himself, in obtaining general letterhead (Defendants' Exhibit C) sought to and succeeded in representing all of defendants' *services,* including sewer and septic tank cleaning and maintenance service, under the title "Veterans Cleaning Service" and self describing them as "General Cleaning Contractors."

Utilizing the rationale of Wirtz v. Savannah Bank & Trust Company of Savannah, 362 F.2d 857 (CA 5–1966), the operation of Roto Rooter's sewer and septic tank cleaning and maintenance activities cannot be divorced from the operations of Veterans Cleaning's commercial building cleaning and maintenance activities or of Rent-A-Maid's residential cleaning and maintenance activities, even absent a declaration of aspirations by the defendants to operate as "General Cleaning Contractors." By definition the word "general" means: "involving or belonging to the whole of a body or group, class or type; applicable or relevant to the whole rather than to a limited part, group or section; applicable to every one in the unit referred to." Webster's Third New International Dictionary (unabridged) 1963 Ed., p. 944. Used in the context of defendants' own choosing, "General Cleaning Contractors," it is obvious that they intend to, did and do perform various activities, but all in the same group, class or type of business—the cleaning and maintenance service business. In testifying as to the inclusion of all of the various cleaning and maintenance service activities on their general letterhead, defendant Ettlinger admitted that in the past they even had cleaning and maintenance services listed other than and in addition to those currently listed. Defendants purposefully created the image of a cleaning and maintenance complex which they cannot now deny for the special and sole purpose of evading or avoiding application of the Act.

This Court can conceive of no reasonable basis to distinguish, for these purposes between the "in-house" cleaning and maintenance services of Veterans Cleaning and Rent-A-Maid, and the "out-house" cleaning and maintenance services of Roto Rooter. By their very nature and by the treatment accorded them by the defendants themselves, there is no other reasonable conclusion that can be drawn than that all of the defendants' activities create the image of an integrated, completedly related common purposed *general cleaning and maintenance service business.* The defendants, therefore, clearly constitute an "enterprise" within the meaning of § 3(r) of the Act. [29 U.S.C. 203(r).]

4. There being no doubt that the defendants' employees regularly handle or otherwise work on and with supplies and equipment that have been received from

and/or produced outside the State of Florida; and that at all times since February 1, 1969, they have had combined annual gross volumes of business done in excess of $250,000, the defendants are and have been since said date an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of § 3(s) of the Act. [29 U.S.C. § 203(s).]

5. Accordingly, each and all of the several defendants' employees are covered under and subject to the minimum wage and overtime provisions of the Act [29 U.S.C. §§ 206 and 207].

6. Since defendants are a § 3(s) enterprise, the exemption from the provisions of §§ 6 and 7 of the Act afforded by § 13(a)(2) of the Act [29 U.S.C. § 213(a)(2)] is not available as to any of their employees.

7. Plaintiff's cause of action is not barred under the provisions of § 10 of the Portal-to-Portal Act [29 U.S.C. § 259].

8. The defendants violated the minimum wage provisions of § 6 and the overtime provisions of § 7 of the Act [29 U.S.C. §§ 206 and 207].

9. The violations of said §§ 6 and 7 were willful, therefore the defendants are liable for back wages for the full 3-year period provided in § 6 of the Portal-to-Portal Act [29 U.S.C. § 255].

■ 10. The plaintiff is entitled to an injunction against further violations of the Act. While it is well settled that the granting or denying of an injunction is discretionary with the trial court, it is equally settled that where, as here, violations of the Act have been repeated, the circumstances clearly warrant the trial court's granting of injunctive relief. Hodgson v. Humphries, 454 F.2d 1279 (CA 10–1972). Cf., Mitchell v. Pidcock, 299 F.2d 281 (CA 5–1962); Lenroot v. Kemp, 153 F.2d 153 (CA 5–1946); Lenroot v. Interstate Bakeries Corporation, 146 F.2d 325 (CA 8–1945); Hecht Co. v. Bowles, 321 U.S. 321, 64 S. Ct. 587, 88 L.Ed. 754 (1944).

11. The defendants shall be restrained from further withholding payment of the minimum wages and overtime compensation herein found to be due their employees.