Peter J. BRENNAN, Secretary of Labor,
United States Department of Labor,
Plaintiff-Appellee,

v.

VETERANS CLEANING SERVICE, INC.,
et al., Defendants-Appellants.

No. 72-3628.

United States Court of Appeals,
Fifth Circuit.

Aug. 16, 1973.

Jere D. McWinn, Jacksonville, Fla., for defendants-appellants.

Beverley R. Worrell, Regional Sol., Anthony B. Cuviello, Atty., U. S. Dept. of Labor, Atlanta, Ga., Carin Ann Clauss, Donald S. Shire, Richard F. Schubert, Sol., Jacob I. Karro, U. S. Dept. of Labor, Washington, D.C., for plaintiff-appellee.

Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.

THORNBERRY, Circuit Judge:

The Secretary of Labor brought suit under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., against Bernard Ettlinger, Veterans Cleaning Service, Inc., Rent-A-Maid, Inc., and Roto Rooter Service of Duval County, Inc. to enjoin them from violating the minimum wage and overtime provisions of the Act and from continuing to withhold payment of minimum wage and overtime compensation due for services performed since February 1, 1969. The district court, sitting without a jury, held for the Secretary and granted the relief sought, 351 F.Supp. 741. Defendants appeal from the judgment entered below arguing (1) that they do not constitute a single enterprise and are therefore not covered by the Act for most of the years in question, and (2) that the district court erred in holding that Amos Jones, a Veterans Cleaning employee, was not paid minimum wage because of certain deductions from his paycheck which reduced the net amount he received below the statutory minimum. We affirm as to coverage and affirm with a modification as to the method for computing Jones' wages for purposes of ascertaining whether he received minimum wage under the Act.

I. Coverage ·

Defendant Bernard Ettlinger is owner and president of Veterans Cleaning and Roto Rooter and is secretary of Rent-A-Maid, which is owned principally by his son. He is operating manager of all three defendant corporations. The corporate defendants have common central office facilities at a single location, and central office functions, such as bookkeeping, billing, and ordering, are performed by common employees. All supplies and equipment used in defendants' activities are stored and maintained in a common storage area. Maintenance and repair work on defendants' motor vehicles is performed by a common employee in a common service area.

The district court described the business of each corporate defendant as follows:

*Veterans Cleaning* is an industrial-commercial janitorial, window washing and maintenance firm. While its services are performed primarily on a contract basis for and in offices and places of business, it does, on occasion perform such services in and at private residences. Such services consist of dusting, sweeping and waxing floors, cleaning restrooms, vacuuming and shampooing rugs, shampooing furniture, taking out trash, etc. Employees are transported to and from their particular jobs, along with all necessary equipment and supplies in trucks belonging to Veterans Cleaning.

*Rent-A-Maid* furnishes maids primarily to private residences, for one,

two or more days on a "customer need" basis. The company furnishes merely a maid in uniform. All cleaning equipment, supplies and materials are furnished by the individual householder. The maids are transported to and from their particular jobs in trucks belonging to Veterans Cleaning or in the private automobiles of defendant Ettlinger or his son.

*Roto Rooter* is a sewer and septic tank cleaning and maintenance service. This service is provided to customers who call in to have their sewers, sinks, commodes, tubs, floor drains or septic tanks (including drain fields) unclogged, cleaned and maintained. Employees and equipment are transported to and from the particular job in trucks belonging to Roto Rooter. [citations to trial transcript omitted.]

Although the corporations have separate equipment, the trucks of Veterans Cleaning and Roto Rooter are sometimes interchanged "on an emergency basis." The employees of the three corporations are generally separate both as a bookkeeping matter and in the work they do, but some employee witnesses testified that they regularly changed employment among the three companies. To some extent the three companies are held out to the public as related; on Veterans Cleaning's letterhead business stationery a bold line runs from the words "General Cleaning Contractors" in large print at the top of the page to a list of six "cleaning" businesses, which includes Roto Rooter and Rent-A-Maid.

Whether the defendants are covered by the Fair Labor Standards Act depends on whether they are an "enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C.A. § 206(a). That term is defined in pertinent part as

an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

(1) . . . beginning February 1, 1969 is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated).

29 U.S.C.A. § 203(s). It is undisputed that all defendants have been engaged in commerce at all times relevant to this action. Further, it is not contested that Veterans Cleaning had a gross annual volume in excess of $250,000 in 1969, and that Roto Rooter had a gross annual volume over that amount in 1971, so that considered as separate enterprises those two defendants were covered by the Act in those years, respectively, regardless of coverage of the other defendants.[1] *See* Brennan v. Hatton, 5th Cir. 1973, 474 F.2d 9. The disputed issue is whether all defendants—the three corporations and Ettlinger as principal owner and manager—must be grouped together and considered to be a single "enterprise" under the Act. Defendants' aggregate gross annual volume has exceeded $250,000 since before 1969, so that if they are considered a single enterprise, they are all covered by the Act, including the minimum wage and overtime provisions, and have been covered since February 1, 1969.

---

1. The district court found the following annual gross volumes for the years indicated:

|  | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|
| Veterans Cleaning Service | $265,636.38 | $293,337.98 | $241,609.16 | $208,612.26 |
| Rent-A-Maid | | 12,468.05 | 16,516.20 | 9,793.10 |
| Roto Rooter Sewer Service | 109,230.77 | 156,433.50 | 230,187.46 | 310,758.59 |
| Totals — | $374,867.15 | $462,239.53 | $488,312.82 | $529,163.95 |

■ "Enterprise" is defined in the Act as

the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units. . . .

29 U.S.C.A. § 203(r). Thus, three elements must coexist if defendants are to be considered a single enterprise: (1) related activities, (2) unified operation or common control, and (3) a common business purpose. *See* Brennan v. Arnheim and Neely, Inc., 1973, 410 U.S. 512, 93 S.Ct. 1138, 35 L.Ed.2d 463; Wirtz v. Savannah Bank and Trust Co., 5th Cir. 1966, 362 F.2d 857, 859. Appellants admit as they clearly must, that the element of common control is present in this case, but they deny that the activities of the three corporations are "related activities . . . for a common business purpose."

The legislative history of the Fair Labor Standards Act sheds light on the meaning of the word "related" in § 203(r). The Report of the Senate Committee on Labor and Welfare, Senate Report No. 145, 87th Cong. 1st Sess. 31 (1961) U.S.Code Cong. & Admin.News, p. 1660 [hereinafter Senate Report No. 145],[2] explains:

Within the meaning of this term, activities are "related" when they are the *same or similar* such as those of the individual retail or service stores in a chain, or departments of an establishment operated through leasing arrangements. They are also "related" when they are *auxiliary and service activities* such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising, and other services. Likewise, activities are "related" when they are *part of a vertical structure* such as the manufacturing, warehousing, and retailing of a particular product or

products under unified operation or common control for a common business purpose. [Emphasis added.]

Thus, the three "related" concepts indicated in the Senate Report are: "same or similar," "auxiliary and service activities," and "part of a vertical structure." In finding the activities of the defendants to be "related" the district court relied primarily on the "auxiliary and service activities" concept, as developed in Wirtz v. Savannah Bank and Trust Co., *supra*.

■ We agree that the day to day operations of the three corporate defendants and the unified public image they present are such that they must be considered "auxiliary and service activities" under the Act. As examples of such activities Senate Report No. 145 U.S.Code Cong. & Admin.News, p. 1660 lists "central office and warehousing activities and bookkeeping, auditing, purchasing, [and] advertising." An "insurance company which existed for the purpose of serving the needs and convenience of customers who purchased cars from the automobile company" was held to constitute an auxiliary or service activity to a new car sales business in Hodgson v. Harvey Motor Co., 20 Wage & Hour Cas. 493, 68 CCH Lab Cas. ¶ 32,667 (1971), aff'd per curiam, 5th Cir. 1972, 461 F.2d 847. The same case, however, held sale of automobiles and sale of farm implements not to be auxiliary and related when "[t]he only common aspects of [their] operations were the single office in which their separate books were kept, the single bookkeeper in charge of their accounts, and several customers who did business with both companies." In Wirtz v. Savannah Bank and Trust Co., *supra* 362 F.2d at 861, the renting out of office space in a bank's building was held auxiliary to the banking business in the same building where it was shown that the operation of the office building enabled the bank "to locate in a desirable downtown area, to provide space for fu-

2. U.S.Code Cong. & Admin.News, p. 1620 (1961).

ture expansion, to improve the Bank's profit position, both from the standpoint of revenue and taxes, and to strengthen the image of the Bank in the public eye." *See also* Wirtz v. Columbian Mutual Life Insurance Co., 6th Cir. 1967, 380 F.2d 903; Wirtz v. First National Bank and Trust Co., 10th Cir. 1966, 365 F.2d 641. The basis for this holding was not that the operation of an office building was an activity which by its nature aided the banking business,[3] but that the maintenance and rental of office space in the same building with the bank afforded the bank, as a practical and factual matter, substantial advantages in the operation of its primary business of banking. Thus, the *Savannah Bank and Trust Company* case focused on operational interdependence in fact, and not only on the primary activities of the businesses.

In this case the Secretary has shown such interdependence beyond a mere sharing of common office and storage space. First, as demonstrated by the listing of Roto Rooter and Rent-A-Maid on Veterans Cleaning's business stationery under the heading "General Cleaning Contractors," the three defendants are held out to the public as part of a single larger "cleaning" business. The operation of each is used to enhance the public image of the others. Second, the vehicles of Roto Rooter and Veterans Cleaning are interchanged when the need arises, and Veterans Cleaning trucks are sometimes used to transport Rent-A-Maid employees to and from job locations. Thirdly, the employees of the three companies are interchanged with some regularity on a day to day basis. One employee witness testified that although he always received his paycheck from Veterans Cleaning, he frequently worked for Rent-A-Maid and Roto Rooter. On arrival at work in the morning he might be told, for example, "Today you're going to be on Roto Rooter." In view of the high degree of interdependence shown between the three corporations in their day to day operations and in the public image that they sought to create, we think the conclusion is inescapable that the defendants' businesses are auxiliary to each other. *See* Wirtz v. Savannah Bank and Trust Co., *supra*; Wirtz v. First National Bank and Trust Co., *supra*.

The "common business purpose" requirement is not defined in the Act. Senate Report No. 145, U.S.Code Cong. & Admin.News, p. 1660 explains that "[e]leemosynary, religious, or educational and similar activities of organizations which are not operated for profit . . . are not activities performed for a common business purpose." More than a common goal to make a profit, however, must be shown to satisfy the requirement. Wirtz v. Columbian Mutual Life Insurance Co., *supra* 380 F.2d at 907. Many of the considerations relevant in determining whether businesses perform "auxiliary or service activities" are also relevant in ascertaining whether they have a common business purpose. Wirtz v. Savannah Bank and Trust Co., *supra* 362 F.2d at 861. In view of the interdependence of the corporate defendants shown by the Secretary we are satisfied that the facts of this case demonstrate such a purpose. *Cf.* Brennan v. Arnheim and Neely, Inc., supra.

Concluding that defendants perform related activities under common control for a common business purpose, we affirm the district court's holding that each defendant is part of a single enterprise which has been covered by the Fair Labor Standards Act since February 1, 1969.

---

3. An example of a business which would aid a banking business by the nature of the activity it conducted would be an advertising agency which solicited customers for the bank. The advertising agency would be an "auxiliary" or "service" activity regardless of whether it were located in the bank's office building or were connected to the bank's day to day operations by some link other than advertising.

## II. Calculation of Jones' Wages

Defendant Ettlinger deducted from the weekly paychecks of Amos Jones, a Veterans Cleaning employee, a total of $1661.60 during the period from February 5, 1969 through February 11, 1970, so that the net amount Jones actually received during this period fell below minimum wage by $1960.33. The district court held this latter amount to be due to him from his employer. Appellants contend that since Jones received the benefit of the amounts deducted these amounts should be counted as part of his wages.

The record reflects that the deductions, which were not segregated on the company's books, were made for at least four different purposes. The first purpose was to repay to the employer advances, or "draws", made to Jones before the regular Friday payday. Deductions were also made to repay certain amounts expended by Veterans Cleaning in connection with a traffic accident in which Jones was involved. Defendant Ettlinger's testimony indicated that Jones had, while driving a company truck in an intoxicated state, destroyed the truck and an automobile belonging to a third party.[4] Following the accident criminal charges, including driving while intoxicated and leaving the scene of an accident, were brought against Jones, and he was eventually fined $300,
prompt payment of which, was, according to Ettlinger, necessary for his speedy release from jail. Veterans Cleaning paid the fine at Jones' request, and spent the amount necessary to replace its truck and to compensate the third party for the loss of his automobile. Deductions were made to repay the company for these three types of expenditures pursuant to an assignment of wages executed by Jones, in which he agreed to weekly deductions of $15 until repayment was made in full.

The district court viewed the deductions for repayment of advances as proper but considered the other deductions to be improper. Since amounts of the various deductions could not be figured from company books—which listed all deductions under the heading "Miscellaneous Deductions"—the court treated all deductions as improper.[5]

In ascertaining the permissibility of the various deductions to the extent that they reduced Jones' net pay below minimum wage, we must recognize that Congress' declared purpose in enacting the Fair Labor Standards Act was to correct "conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C.A. § 202(a). The minimum wage provisions are intended to enable those dependent on employment by others for

---

4. The central portion of defendant Ettlinger's testimony relating to the events referred to in the text was:

We have one other employee by the name of Amos Jones, window cleaner, who took a truck from the office, proceeded to get drunk, wrecked the truck, wrecked the car, left the scene, was arrested for drunk, leaving the scene of an accident, causing an accident, causing a second accident, where we paid for our truck, paid Parrish Motors for replacing the vehicle he wrecked, paid a $300.00 fine and I can go on and on, and of course he then turned around and gave me an assignment when his wife came and cried that he was going to be in jail forever and they'd starve to death, so I paid his fine, got him out of jail and was trying to get my money back a little

along and along, ten or fifteen dollars a week plus whatever he would manage to wheedle out of me on draw day as an advance on wages.

5. The pertinent portion of the district court's opinion reads:

Since there is no identification or segregation on defendants' records distinguishing what might be valid deductions, such as payroll advances made within a workweek, from improper deductions, such as for truck repairs, police fines and failure to perform penalties that reduced wages below statutory minimums, all deductions must be treated as improper in instances where they caused weekly wages to fall below statutory minimum wages or overtime rates.

livelihood to maintain the minimum standard of living referred to in the Act. *See* Brooklyn Bank v. O'Neil, 1945, 324 U.S. 697, 706–707, 65 S.Ct. 895, 902, 89 L.Ed. 1296.

To this end, the minimum wage required must normally be paid "free and clear":

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or another person for the employer's benefit the whole or part of the wage delivered to the employee.

29 C.F.R. § 531.35.

The only statutory exception to the requirement that wages be paid free and clear appears in 29 U.S.C.A. § 203(m), which allows the employer to count as wages "the reasonable cost . . . to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." One other exception has been judicially recognized; repayment to the employer of amounts misappropriated by the employee may be made by means of paycheck deductions, even where they reduce the net pay to the employee below minimum wage. *See* Mayhue's Super Liquor Stores, Inc. v. Hodgson, 5th Cir. 1972, 464 F.2d 1196, cert. denied 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688. In such cases the employee has actually taken the money free and clear and had the use of it. "In such a case there would be no violation of the 'Act' because the employee has taken more than the amount of his wage and the return could in no way reduce his wage below the minimum." *Id.* at 1198. The Act was not intended to protect employees against return of amounts wrongfully taken.

We agree with the district court that a similar rule should obtain for repayment by paycheck deductions of free and clear advances to employees, for the Act does not require inflexibility in the timing of the payment of wages or seek to discourage loans to employees. Unlike the district court, we think this loan-repayment principle should likewise apply to deductions to pay third-party creditors of the employee at the employee's direction and with his consent, or to recoup such amounts already paid out, when the employee has consented to the arrangement. When an employer has paid a third party at the employee's request, the employee has had the use of the money for a purpose of his choosing, perhaps for some emergency. Although the transaction is complicated slightly by the involvement of a third party, the payment by the employer to the third party is equivalent to a loan to the employee, or an advance against his salary. Accordingly, deductions to recoup the outlay must be counted as wages. Under this rule, the deductions to recoup amounts expended to pay Jones' fine and to compensate the owner of the automobile damaged in the traffic accident were permissible and should be counted as wages to the extent their amounts can be ascertained.

A debt allegedly owed by the employee directly to the employer which arises out of a non-loan transaction is subject to different considerations. Jones' destruction of the truck did not involve the supplying of board, lodging, or other facilities to him and did not net him any free and clear payment. The deductions from his paycheck to pay for the truck reduced his net wage below the statutory minimum wage. They impaired his ability to maintain the minimum standard of living contemplated by the Act and thus circumvented the protection sought to be afforded him by the Act. It is true that an employee may have a bona fide undisputed debt to his employer, not arising out of a loan transaction, and that repayment of the debt by means of paycheck deductions

represents a benefit to the employee, but we do not believe that this type of benefit is the free and clear minimum payment required by the Act as wages. Nor may the otherwise impermissible deductions be authorized by a "voluntary" assignment of wages by the employee. It has long been recognized that the protection afforded by the Fair Labor Standards Act may not be waived by agreement between employer and employee. Brooklyn Bank v. O'Neil, 1945, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296. If the deduction were made at the employee's direction for the purpose of paying another creditor besides the employer, it might properly be considered part of his wages, but the employer-employee relationship brings into play special considerations, including the superior bargaining position of the employer. The voluntariness of an assignment of wages to the employer is inherently suspect. When the employer is the creditor, payment may not be made by paycheck deductions which reduce net pay below minimum wage, even where the employee apparently consents to such an arrangement. Accordingly, we hold the deductions to repay the employer for the damage to the truck were impermissible.

The Secretary's regulations under the Act are in accord with this view:

> Where an employer is directed by a voluntary assignment or order of his employee to pay a sum for the benefit of the employee to a creditor, donee, or other third party, deductions from wages of the actual sum so paid is not prohibited: *Provided*, That neither the employer or any person acting in his behalf or interest, directly or indirectly, derives any profit or benefit from the transaction. In such case, payment to the third person for the benefit and credit of the employee will be considered equivalent, for purposes of the Act, to payment to the employee.

29 C.F.R. § 531.40(a). The quoted portion of the regulation permits deductions at the direction of the employee to pay a third party, but only where the employer does not benefit from the transaction. Since the employer clearly does benefit from deductions made to satisfy a debt owed to him, such deductions are prohibited to the extent they cut into the employee's minimum wage.

■ ■ The district court correctly imposed on the employer the burden of segregating permissible deductions from impermissible ones. The Secretary's regulations require the employer to keep records reflecting "the dates, amounts, and nature of the items which make up the total additions and deductions." 29 C.F.R. § 516.2(a)(10). The employer in this case failed to keep such records and listed all deductions indiscriminately under the heading "miscellaneous deductions." Since some of the deductions— specifically, those to recoup the amount spent to replace the Veterans Cleaning truck destroyed by Jones—were shown to be invalid, the district court properly treated all deductions as invalid which could not be segregated from the truck deductions. *Cf.* Shultz v. Hinajosa, 5th Cir. 1970, 432 F.2d 259, 261. Thus, even though deductions to recoup advances made to Jones before the regular pay days and to recover the amount spent to pay for damages caused by Jones to the automobile of a third party were valid as a matter of principle, they could not be credited as wages in this case because the amounts of these deductions could not be separately shown. They were commingled with the invalid truck deductions. Defendant Ettlinger's testimony regarding payment of the $300 fine, however, adequately segregated this amount from the remainder of the deductions, and this $300 should therefore have been counted as wages. The judgment of the district court must accordingly be modified to show the amount due Jones from Veterans Cleaning to be $1660.33 rather than $1960.33.

The Judgment of the district court is modified and, as modified, affirmed.