91 F.3d 154
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Robert B. REICH, Secretary of Labor, United States
Department of Labor, Plaintiff-Appellant, Cross-Appellee,
v.
JAPAN ENTERPRISES CORPORATION, a corporation, Ameriana
Corporation, a corporation, Saipan Futaba Group Corporation,
a corporation, Takaharu Komoda, an individual, and Hideaki
Sawada, an individual, Defendants-Appellees, Cross-Appellants.
 Nos. 94-17151, 95-15074.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 6, 1996.
Decided July 10, 1996.
 
 Before: BROWNING, WRIGHT and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The Department of Labor brought a Fair Labor Standards Act (FLSA) enforcement action against three Saipan corporations and two persons alleging statutory violations. See 29 U.S.C. §§ 201-19. The defendants own nightclubs, hiring young Filipinas to work as hostesses and dancers. The district court concluded that the defendants had violated several FLSA provisions, but limited damages, finding that the violations were not willful and that defendant Saipan Futaba Group (SFG) was not part of the enterprise. Both parties appeal. We affirm in part, reverse in part and remand.
 
 
 3
 Because we adopt the district court's findings of fact, we do not repeat them here. We note that many of the court's conclusions depended on whom the court found credible and chose to believe. We give special deference to the court's credibility findings. United States v. Ramos, 923 F.2d 1346, 1356 (9th Cir.1991).
 
 ANALYSIS:
 I. Enterprise Liability
 
 4
 The FLSA minimum wage and overtime provisions apply to employees of an "enterprise" engaged in interstate commerce. See 29 U.S.C. § 203(r). Before trial, the three corporations and Komoda stipulated that they were an enterprise for purposes of FLSA liability. Despite the stipulation, the district court held that SFG was not part of that enterprise. The court did not specifically point to any facts as the basis for its opinion, but noted that at the time the stipulation was signed, SFG had not yet been named as a party.
 
 
 5
 Whether companies constitute an enterprise is a three-part test. See id.; Martin v. Deiriggi, 985 F.2d 129, 133 (4th Cir.1992). They must (1) perform related activities; (2) under unified operations or common control; (3) for a common business purpose. Id. We review de novo a determination of enterprise liability. Brock v. Hamad, 867 F.2d 804, 806 (4th Cir.1989).[1] We hold that for FLSA purposes, SFG was a part of the nightclub enterprise.
 
 A. Related Activities
 
 6
 Related activities are "operation[s] through substantial ownership or control of a number of firms engaged in similar types of business activities." S.Rep. No. 1487, 89th Cong., 2d Sess., 1966 U.S.C.C.A.N. 3002, 3009. Activities are related if they are "the same or similar." S.Rep. No. 145, 87th Cong., 1st Sess. 31, 1961 U.S.C.C.A.N. 1620, 1660. Although each corporation offered slightly different entertainment, all three were nightclubs catering to visiting businessmen, serving alcoholic beverages and featuring young Filipinas. See Donovan v. Grim Hotel Co., 747 F.2d 966, 970 (5th Cir.1984) (rejecting argument that hotels did not have related activities where some served short-term guests and others served long-term guests), cert. denied, 471 U.S. 1124 (1985). Moreover, the clubs shared the same barracks, the same rules and regulations, and the same promotion agency, which provided employees only for them. The defendants, including SFG, clearly performed related activities.
 
 B. Common Control or Unified Operations
 
 7
 In determining whether there is common control, courts heavily emphasize common ownership. See, e.g., Reich v. Bay, Inc., 23 F.3d 110, 115 (5th Cir.1994); Grim Hotel, 747 F.2d at 970; Donovan v. Easton Land & Dev., Inc., 723 F.2d 1549, 1552 (11th Cir.1984). Komoda, the owner of Japan Enterprise Corporation's (JEC's) Micronesia Club and previous owner of Ameriana's Happiness Club, is the common link of ownership among the companies. Although Eizo Tambo was the president and majority owner of SFG, Komoda contributed substantially to the funding and organization of the corporation. See 29 C.F.R. § 779.221 (" 'Common' control includes the sharing of control and it is not limited to sole control or complete control by one person or corporation."). Komoda was an SFG director and the secretary/treasurer, described himself as the vice president, and owned 25% of the shares.
 
 
 8
 Other factors also demonstrate that SFG was under common control by the enterprise. Komoda hired SFG's two managers from nightclubs he owned in Japan. He directed the Mayten managers to begin complying with the FLSA as each violation surfaced. See Grim Hotel, 747 F.2d at 970 (two factors are of the "utmost significance": whether a common person had the power to hire and fire the manager in each company and whether a common person could approve adherence to the FLSA). When SFG dissolved, Komoda signed the dissolution papers. See Easton Land, 723 F.2d at 1552 ("[D]eterminative question is whether a common entity has the power to control the related business operations."). We conclude that SFG was under common control.
 
 C. Common Business Purpose
 
 9
 "Common business purpose" is not defined by the FLSA, but the test is about the same as the one for related activities. See Brock v. Executive Towers, Inc., 796 F.2d 698, 700 (4th Cir.1986); cf. Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1367 (5th Cir.1973) ("More than a common goal to make a profit ... must be shown to satisfy the requirement."). These nightclubs shared a common purpose, which was to provide entertainment, alcohol and female companionship for businessmen.
 
 D. Conclusion
 
 10
 SFG has related activities and a common purpose with the other defendants. Although it is less clear whether SFG was subject to common control by the enterprise, "[t]he Fair Labor Standards Act is to be construed liberally because by it Congress intended to protect the country's workers." Grim Hotel, 747 F.2d at 971. We hold that SFG was part of the enterprise within the intent of the FLSA.
 
 
 11
 II. Komoda's and Sawada's Liability as Employers
 
 
 12
 The district court found that Komoda and Sawada were each an "employer" only as to his own company. An employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). To be an employer, the person is not necessarily required to have an ownership interest or control of day-to-day operations. See Reich v. Circle C Investments, Inc., 998 F.2d 324, 329 (5th Cir.1993). " 'The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications.' " Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir.1991) (citation omitted). The application of the statute is reviewed de novo, the underlying facts for clear error. Id.
 
 
 13
 The government points to little evidence that Komoda was directly involved in Ameriana's New Happiness Club after he "sold" it to Sawada. Sawada and his wife owned 100% of the stock and Komoda did not work there. The court's finding is neither clearly erroneous nor legally incorrect. Komoda, however, was an employer of the Mayten Club. He was a corporate officer with a substantial ownership interest and was directly involved in decisions affecting the employees. See Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir.1983); see also Elliott Travel, 942 F.2d at 965; Grim Hotel, 747 F.2d at 971. Komoda is personally liable for the violations at JEC and SFG.
 
 
 14
 The district court held that Sawada was personally liable for violations at Ameriana's New Happiness Club. We hold that he is also liable for violations at JEC where he served as general manager for the Micronesia Club. See Agnew, 712 F.2d at 1510 ("There may be several simultaneous employers."). He was in charge of the employees at the club and managed the day-to-day operations. He represented JEC as a corporate agent. He regularly traveled to the Philippines to recruit employees and he signed their employment contracts. The fact that Sawada does not have an ownership interest in JEC is not determinative. See Donovan v. Sabine Irrigation Co., Inc., 695 F.2d 190, 195 (5th Cir.), cert. denied, 463 U.S. 1207 (1983). We hold that he was an employer at JEC for purposes of FLSA liability.
 
 III. Willfulness
 
 15
 The government appeals the district court's finding that the defendants' FLSA violations were not willful. Willful violations are subject to a three-year statute of limitations and nonwillful violations to a two-year statute. 29 U.S.C. § 255(a). Although we review de novo whether statutory violations are willful, see Baker v. Delta Air Lines, Inc., 6 F.3d 632, 644 (9th Cir.1993) (reviewing ADEA violation), the district court's decision was based on its factual findings which we review only for clear error.
 
 
 16
 To be willful, the government must show that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). The Supreme Court has rejected the argument that mere awareness of the FLSA is sufficient to prove willfulness. Id. "If an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action" is not willful. Id. at 135 n. 13.
 
 
 17
 Although the defendants violated several FLSA requirements, the court found that when each violation was brought to the attention of the defendants, they corrected the problem. Moreover, several of the issues involved in the violations, such as whether restricted hours require compensation, are not completely clear areas of law. See Reich v. Gateway Press, Inc., 13 F.3d 685, 703 (3d Cir.1994) (violations not willful where there are "close questions of law and fact"). Applying the McLaughlin test to the court's findings of fact, we cannot say that the defendants' conduct was willful.
 
 IV. Promotions and Recruitment Costs
 A. Relationship with Komoda
 
 18
 The government argues that the district court clearly erred in finding that Komoda had no agency relationship with the two promotions companies, I.V. Promotions and Inaoya Promotions. Because the defendants did not use I.V. Promotions within the two-year limitations period, we do not consider whether the court's finding as to that company was correct. As to Inaoya, the district court's finding is supported by testimony and is not clearly erroneous. See Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").
 
 B. Payments to the Recruiting Company
 
 19
 An employer may not require employees to make payments for "facilities" that would reduce their hourly pay below the minimum wage. 29 C.F.R. § 531.3(d). The government argues that the defendants are obliged to reimburse the employees for their recruitment costs, but cites no case, statute or regulation that requires an employer to pay recruiting costs to a third-party recruiter.[2]
 
 
 20
 The government also argues that any deductions from the employees' paychecks were an illegal kickback. See 29 C.F.R. §§ 531.35, 531.40. FLSA regulations prevent an employer from deducting from an employee's paycheck on behalf of a third-party if the deduction directly or indirectly benefits the employer. See 29 C.F.R. § 531.40(a); Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1370 (5th Cir.1973). The regulations seek to prevent employers from pushing their costs of doing business onto their employees.
 
 
 21
 Although this argument may have prevailed in relation to the enterprises' earlier collection practices, there was little evidence that the defendants directly or indirectly made or benefited from deductions during the limitations period. During the relevant time, the employees received full paychecks, then deposited all or a portion into a separate bank account. The court made an explicit finding that the employees repaid their notes voluntarily and that these collection methods were not coercive. This finding was supported by evidence at trial.
 
 
 22
 Based on the court's explicit findings, we hold that the defendants were not responsible for paying for the employees' recruiting costs.
 
 V. Recordkeeping Violations
 
 23
 The government challenges the court's finding that the defendants had not violated their FLSA recordkeeping obligations. This finding was supported by some evidence and was not clearly erroneous. See Service Employees, 955 F.2d at 1317 n. 7. We affirm.
 
 VI. Failure to Issue a Permanent Injunction
 
 24
 The government contends that the court abused its discretion in refusing to issue a permanent injunction. See United States v. Yacoubian, 24 F.3d 1, 3 (9th Cir.1994). In FLSA cases, a district court does not have unfettered discretion on whether to grant an injunction. "[Alt]hough the district court has discretion to deny injunctive relief in appropriate cases, this discretion is limited by consideration of the importance of prospective relief as a means of ensuring compliance with the provisions of the FLSA." Brock v. Shirk, 833 F.2d 1326, 1331 (9th Cir.1987), judgment vacated on other grounds, 488 U.S. 806 (1988); see also Brock v. Big Bear Market No. 3, 825 F.2d 1381, 1383 (9th Cir.1987) ("The exercise of discretion is not unbridled.").
 
 
 25
 Our precedent weighs heavily in favor of issuing an injunction once a defendant has been found to have violated the Act. In Marshall v. Chala Enters., Inc., 645 F.2d 799, 804 (9th Cir.1981), we held that the district court abused its discretion where it failed to issue an injunction although the plaintiff was in present compliance, promised future compliance, and had learned an expensive lesson from the litigation. The court emphasized that:
 
 
 26
 'The injunction subjects the defendants to no penalty, to no hardship. It requires the defendants to do what the Act requires anyway--to comply with the law.... [T]he manifest difficulty of the Government's inspecting, investigating, and litigating every complaint of a violation weighs heavily in favor of enforcement by injunction--after the court has found an unquestionable violation of the Act.'
 
 
 27
 In exercising its discretion, the district court must give substantial weight to the fact that the Secretary seeks to vindicate a public, and not a private, right.
 
 
 28
 Id. (citations omitted). Multiple violations of the FLSA favor granting of an injunction. See Big Bear, 825 F.2d at 1383.
 
 
 29
 Although the court found that the defendants were not likely to violate the Act in the future, its decision is not consistent with our precedent or with the remedial goals of the FLSA. We reverse and remand for imposition of a permanent injunction.
 
 VII. Confinement and Restricted Time
 
 30
 Defendants appeal the court's conclusion that employees must be paid for the four hours each day that they were confined to the barracks and for the approximately three hours each day they were "restricted." Whether an employee must be compensated for off-duty hours is a question of law reviewed de novo. Berry v. County of Sonoma, 30 F.3d 1174, 1180 (9th Cir.1994), cert. denied, 115 S.Ct. 1100 (1995). Underlying facts are reviewed for clear error. Id. Whether an employee is able to use non-work time effectively is a factual question. Id.
 
 
 31
 The court found that the women were confined to the employer-owned barracks from 2:00 a.m. to 6:00 a.m. Between 6:00 a.m. and 8:00 p.m., they could leave the barracks only by signing out, giving a destination and being accompanied by two or more employees. The court found that these restrictions prevented the employees from being able to use their non-work time effectively for their own purposes. There is ample evidence to support these findings, including the defendants' own rules and regulations.
 
 
 32
 Defendants contend that sleep-time compensation cases, in which employees must sleep at the employer's premises to be available if needed for work, and on-call time cases are the most analogous. See, e.g., Skidmore v. Swift & Co., 323 U.S. 134, 137 (1944) (sleep time); Owens v. Local No. 169, 971 F.2d 347, 350 (9th Cir.1992) (on-call time).
 
 
 33
 The on-call and sleep time cases, however, are not determinative. The employees here were not on-call. They were confined in the barracks and severely restricted during their "free time" without any "legally recognized justification" or work-related need. Under these unique circumstances, we affirm the award of compensation for four hours of confinement time and three hours of restricted time.
 
 VIII. Employees' Dresses
 
 34
 Defendants argue that the district court erred as a matter of law in holding that they should pay for the employees' cocktail dresses worn at work. Where the nature of an employer's business requires the employee to wear a uniform, the employer may not require her to pay for it if the cost of purchase and cleaning brings the average wage below the minimum wage. See 29 C.F.R. §§ 531.3(d)(1), (2), 531.32(c). Whether a prescribed outfit is considered a "uniform" is made on a case-by-case basis. See 6A Lab.Rel.Rep. p 95:109.
 
 
 35
 Defendants would have us say that this situation is similar to a requirement that male employees wear white shirts and dark trousers on the job. Those men would be required to pay for their own outfits. See Wage Hour Publication 1428 (March 1984). We find no similarity. These "sexy" dresses were of no use except at the nightclubs and were not worn elsewhere.[3]
 
 
 36
 The uniforms must be paid for by the defendants.
 
 CONCLUSION:
 
 37
 We affirm in part, reverse in part and remand. The defendants' request for attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(a)(1), (b), (d)(1)(A), is denied. The parties will bear their own costs on this appeal.
 
 
 38
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 A company qualifies individually as an "enterprise" if it has an annual gross sales volume of more than $500,000. 29 U.S.C. § 203(s)(1)(a)(ii). Because we hold that SFG was part of the enterprise, we do not reach the government's contention that SFG is individually liable based on its 1990 gross income. We note, however, that the district court erred by considering the average gross income over the three years instead of each annual amount. See id
 
 
 [2]
 The government cites Marshall v. Glassboro Serv. Assoc., 24 Wage and Hour Cas. 1297 (B.N.A.) (D.N.J.1980) for the proposition that "costs associated with the new hire of employees are to be borne by the employer." The case does not so hold. It says only that in that case the employer was required to pay the employees' initial transportation costs. The employers, here, paid the women's airfare from Manila to Saipan
 
 
 [3]
 Defendants make much out of one employee's testimony that she once wore the top of an outfit to church. The guidelines, however, do not say that an outfit may never be worn elsewhere. It is possible that a portion of the outfit could be worn outside work but still be the financial responsibility of the employer. See, e.g., Reich v. Priba Corp., 890 F.Supp. 586, 596-97 (N.D.Tex.1995); Hodgson v. Newport Motel, Inc., 87 Lab.Cas. p 33,830 (S.D.Fla.1979)