Robert REICH, Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

PRIBA CORPORATION,
et al., Defendants.

Civ. A. No. 3:91–CV–2786–G.

United States District Court,
N.D. Texas,
Dallas Division.

March 27, 1995.

Robert E. Luxen, Crouch & Hallett, Dallas, TX, pro se, special master.

Robert Allen Fitz, James Edward White, Brian Lee Pudenz, Marshall J. Breger, Bobbie Gannaway McCartney, Nancy Bowers Carpentier, U.S. Dept. of Labor, Office of Sol., Dallas, TX, Olivia Tanyel Harrison, Strasburger & Price, Houston, TX, for plaintiff Robert Reich.

Cynthia M. Wheless, Wheless & Walker, Plano, TX, John V. Jansonius, Shannon Brown Schmoyer, Akin Gump Strauss Hauer & Feld, Dallas, TX, Lynn C. Hensley, Hensley & King, Rockdale, TX, for defendants Priba Corp., Prive Corp., Manana Valet Corp., Salah Izzedin.

### MEMORANDUM OF DECISION

FISH, District Judge.

#### I. INTRODUCTION

This case is brought by Robert Reich, Secretary of Labor, United States Department of Labor (the "Secretary" or the "DOL") under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA"), against Prive Corporation ("Prive"), Priba Corporation ("Priba"), and Salah Izzedin ("Izzedin") (sometimes collectively "the defendants" or "Cabaret Royale"). Following a bench trial on October 20, 21, and 22, 1993, the court has reached the following findings of fact and conclusions of law.

#### II. BACKGROUND

1. The DOL is an agency of the United States charged with the administration, interpretation, and enforcement of the FLSA.

2. All parties have been correctly designated and venue is proper in this court.

3. The court has subject matter jurisdiction over this case pursuant to the FLSA, 29 U.S.C. §§ 216–17.

4. Priba was incorporated under the laws of the state of Texas on October 12, 1987. Pretrial Order ¶ C(1). Prive was incorporated under the laws of the state of Texas on January 19, 1988. *Id.* ¶ C(2). Both Priba and Prive are and have been, during all relevant periods, corporations with a place of business and doing business at the same location in Dallas, Texas and are within the

jurisdiction of this court. Izzedin is an individual who at the time of trial resided in Houston, Texas. Pretrial Order ¶ C(3).

5. Prive and Priba jointly operate a night club and restaurant known as Cabaret Royale and are engaged in interstate commerce. Pretrial Order ¶ C(4), (5), (6), (11). *See* ¶ 7 below. Joe Najjar ("Najjar") serves as a managing director of Cabaret Royale. TR 2:156.[1] In that capacity, Najjar is responsible for the day-to-day operation of the club. *Id.*

6. Entertainers at Cabaret Royale are topless female dancers. Pretrial Order ¶ C(10); TR 1:22; 3:40.

### III. *PRIBA AND PRIVE: ENTERPRISE STATUS*

7. Priba and Prive have been engaged in related activities for a common business purpose, as shown by following facts:

a. Priba and Prive operate out of the same business location for the common purpose of operating Cabaret Royale. TR 2:114–16, 132, 156, 160–61; 3:40. Prive holds the liquor license and Priba holds the sexually oriented business license for Cabaret Royale. TR 1:24. The topless entertainers work for Priba, TR 1:25, while Prive employs the waitresses and other food service personnel. TR 1:24–25.

b. Priba and Prive are consolidated for income tax purposes. TR 1:32. Both companies operate under the trade name "Cabaret Royale." TR 1:22.

c. Corporate officers who testified at trial never distinguished one corporation from the other. Instead, they simply referred to the combined operation as Cabaret Royale. TR 2:114–16, 132, 156, 160–61.

d. Priba is the parent of Prive and exerts at least some control over the unified operation. TR 1:25.

e. Accounting functions for Priba and Prive are executed through a combined accounting department. TR 1:21–22.

f. Both corporations share common officers. TR 1:21–22; 2:98 (referring to answers to interrogatories on file with the court which were read into the record).

g. Izzedin is the sole stockholder in both Priba and Prive. TR 2:98 (again referring to answers to interrogatories on file with the court which were read into the record).

8. Prive recorded gross sales for the year 1989 in the amount of $2,653,970.00 and reported $6,944,820.00 in gross sales for the year 1991. TR 1:20 (referring to answers to interrogatories read into the record). Priba reported $866,124.00 in gross sales for 1989 and $2,083,494.00 in gross sales for 1990. *Id.* Cabaret Royale recorded annual gross sales of approximately $3.5 million dollars in 1992. TR 3:21–22. *See also* stipulations by defendants in Defendants' Response in Opposition to Plaintiff's Motion to Compel Kay Sheppard, Defendants' Corporate Controller, To Bring Certain of Defendants' Documents to Trial ¶ II.

9. The FLSA defines the term "enterprise" as follows:

> the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units.

§ 3(r)(1), 29 U.S.C. § 203(r)(1).

■ 10. Priba and Prive constitute an "enterprise" within the meaning of § 3(r)(1), 29 U.S.C. § 203(r)(1), because they perform related activities through common control for a common business purpose. *See Donovan v. Janitorial Services, Incorporated,* 672 F.2d 528, 530 (5th Cir.1982); *Brennan v. Veterans Cleaning Service, Inc.,* 482 F.2d 1362, 1366 (5th Cir.1973); *Shultz v. Mack Farland & Sons Roofing Co.,* 413 F.2d 1296, 1299 (5th Cir.1969).

11. Priba and Prive hold themselves out to the public under the common operating name Cabaret Royale, share office space, and

---

1. The transcript will be referred to by the volume and page number. Hence, TR 2:156 means volume 2, page 156 of the transcript.

utilize a combined managerial and clerical staff to further the common purpose and related activity of promoting and operating a gentlemen's club. *See Janitorial Services,* above, 672 F.2d at 530.

12. Prive and Priba operate jointly to manage an upscale gentlemen's club. In this case, joint operation equates to related business activity because neither entity would exist without the presence of the other. Both entities are held out to the public as a single establishment and "each [entity] is used to enhance the public image of the other[ ]." *See Veterans Cleaning Service, Inc.,* above, 482 F.2d at 1367.

13. The common ownership of Priba and Prive by Izzedin and the overlap of corporate officers demonstrates common control of the two corporations. *See Donovan v. Grim Hotel Company,* 747 F.2d 966, 970 (5th Cir. 1984), *cert. denied,* 471 U.S. 1124, 105 S.Ct. 2654, 86 L.Ed.2d 272 (1985). Vesting in Najjar supervision of the day-to-day operations of the combined entity Cabaret Royale also illustrates common control of the entities. *Id.*

14. Priba and Prive constitute "an enterprise engaged in commerce" within the meaning of § 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), because they have employees handling, selling, or otherwise working on alcoholic beverages that have moved in interstate commerce and because their annual gross volume of sales is not less than $500,-000. *Grim Hotel,* above, 747 F.2d at 969–71.

## IV. *STATUS OF SALAH IZZEDIN*

15. Izzedin is the entrepreneur and the promoter behind Cabaret Royale. TR 2:158. He "sets the image" for the club and coordinates the club's expansion plans in other major cities. *Id.*

16. Although not directly responsible for the day-to-day operation of the club, Izzedin stays involved in major policy decisions that would affect the profitability of Cabaret Royale. TR 3:24–25.

17. Izzedin has on occasion hired waitresses at Cabaret Royale. TR 1:56, 66–67.

18. Izzedin owns 100% of the stock in Prive and Priba. TR 2:98.

19. The remedial goals of the FLSA require courts to define "employer" more broadly than the traditional common-law application. *McLaughlin v. Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir.1989). Section 3(d) of the FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The determination of whether a person is an "employer" is essentially a question of fact, and the court must evaluate the totality of the circumstances, focusing on the economic realities of the particular employment relationship. *Donovan v. Sabine Irrigation Co., Inc.,* 695 F.2d 190, 194 (5th Cir.), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1387 (1983).

20. Izzedin contends that he is not an "employer" within the meaning of the FLSA because he (a) has delegated day-to-day operation of Cabaret Royale to a managing director, (b) does not hire or fire employees, and (c) is merely responsible for directing the public relations function of the club. The evidence at trial, however, indicates otherwise. Izzedin is the sole shareholder of both Prive and Priba and hired two of the waitresses who testified at trial. Najjar, who admitted that he consults Izzedin on occasion, conceded that important decisions concerning the status of waitresses and dancers probably could not be made without input from Izzedin. *E.g.,* TR 3:30–31. A defense witness testified that Izzedin "oversees the managers as far as I can tell." TR 2:151. More importantly, Izzedin was the "driving force behind [Cabaret Royale]." *See Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 329 (5th Cir.1993). Izzedin pioneered the concept of an upscale gentlemen's club in Dallas, and his club sets the standard for similarly situated establishments. TR 1:10; 3:39–40. His involvement in developing Cabaret Royale and his subsequent efforts to develop such establishments in other markets, TR 2:158, clearly demonstrate that Izzedin occupies the status of an employer within the meaning of § 3(d) of the FLSA.

*See Grim Hotel Company,* above, 747 F.2d at 971–72.

21. Because Izzedin has been found to be an employer within the meaning of the FLSA, he is jointly and severally liable for all damages which stem from Cabaret Royale's failure to comply with the provisions of the FLSA. *See Lee v. Coahoma County, Mississippi,* 937 F.2d 220, 226 (5th Cir.1991), *modified on other grounds,* 37 F.3d 1068 (5th Cir.1993).

## V. *EMPLOYMENT STATUS OF THE ENTERTAINERS*

22. The DOL estimates that as of October 1993, over 1200 entertainers have performed at Cabaret Royale. TR 2:62. Four of these women testified for the DOL at trial. TR 1:119, 140, 169, 190.

23. On any given date, the number of entertainers performing at Cabaret Royale ranges from 20 to 85. TR 2:83–84, 165.

24. Cabaret Royale requires the entertainers to sign in when they report for work. Although there are limits on when entertainers can report for work, they are allowed to leave the club at any time. Cabaret Royale, however, has routinely barred entertainers from re-entering the club if they leave before their shift is over. Noncompliance with this policy is a basis for termination. Within the shifts established by Cabaret Royale, the entertainers are free to set their own schedules and can perform at the club at any time. TR 1:134, 156–57; 2:163, 167–68; 3:57–59, 71, 73.

25. Cabaret Royale prohibits the entertainers from leaving the club with customers. TR 2:169; 3:36.

26. The entertainers decide whether to work after they sign in at Cabaret Royale. They may use the workout facilities, stay in the dressing room, or roam the club and not perform for the customers. TR 1:209; 2:170.

27. Entertainers are not compelled to perform on stage or to follow a stage rotation. Cabaret Royale does not require the entertainers to actually perform for the customers. TR 1:134; 3:2, 4, 59, 73.

28. Entertainers are required to sign an Independent Contractor Agreement ("Agreement") before they are allowed to perform at Cabaret Royale. The terms of the Agreement are not negotiable. TR 1:166, 188.

29. Cabaret Royale does not prohibit the entertainers from performing at other gentlemen's clubs while they are under contract. Entertainers are free to perform at the clubs of their choice and many choose to do so. TR 1:179–80, 197, 201; 3:7, 86.

30. Some entertainers spend their own money on costumes, makeup, plastic surgery, choreography, and personal fitness trainers. Expenses of this nature are not incurred by all of the entertainers, however, nor are they required as a prerequisite to perform at Cabaret Royale. TR 1:122–23, 191, 203; 3:4, 8–9.

31. Cabaret Royale provides the facilities and advertising for the entertainers. The entertainers neither invest risk capital in the operation of Cabaret Royale nor pay rent for the use of the club. TR 1:128, 175–76; 2:115–17, 119–21, 131, 156, 158; 3:22–23, 40.

32. Some entertainers travel to other cities to perform and must invest in these travel expenses. TR 3:8–9, 86.

33. Prior dance experience is not a prerequisite for employment at Cabaret Royale. TR 1:122, 140, 170, 191.

34. The ability to engage in conversation with club patrons and to develop a continuing relationship with some of them may increase an entertainer's revenue. TR 2:169–70; 3:8.

35. At the time of trial, there were over thirty (30) gentlemen's clubs in the Dallas–Fort Worth area at which entertainers could perform. TR 3:16.

36. Entertainers often earned in excess of $150.00 performing at Cabaret Royale, but sometimes they did not earn enough to cover expenses. TR 1:153–54, 183–84, 203.

37. As of October 1993, out of the 1200 or more entertainers who had performed at Cabaret Royale at one time or another, only ten (10) had performed there on a consistent basis throughout the club's operation. TR 1:156; 3:6. The nature of the employment relationship between the entertainers and Cabaret Royale is highly transient. TR 3:6.

38. The terms "employee" and "independent contractor" are not to be construed in their common law senses when used in federal social welfare legislation. *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297, 299 (5th Cir.1975) (citing *Rutherford Food Corporation v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (interpreting FLSA)).

39. The touchstone for determining whether an individual is an "employee" under the FLSA is economic dependence. Accordingly, a court must consider several elements in evaluating economic dependence: degree of control; skill and initiative; opportunities for profit and loss as related to the activities of the alleged employer; investment in facilities; and permanency of relationship. *United States v. Silk,* 331 U.S. 704, 712–19, 67 S.Ct. 1463, 1467–71, 91 L.Ed. 1757 (1947); *Circle C.,* above, 998 F.2d at 326–29; *Usery v. Pilgrim Equipment Company, Inc.,* 527 F.2d 1308, 1311 (5th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976). No one element is more important than another in defining the employment relationship. The court's "focal inquiry in determining employee status is whether the individual is, as a matter of economic reality, in business for herself." *Circle C.,* above, 998 F.2d at 327; *see also Mednick,* 508 F.2d at 302, n. 6 ("[T]he test of 'economic reality' goes to the question of whether the individual ... was in fact an independent business [woman]").

## A. *Control*

40. In analyzing control, this court must examine the economic reality of the entertainer's position. An ability to work at other establishments is not dispositive of the issue. *McLaughlin v. Seafood, Inc.,* 861 F.2d 450, 452 (5th Cir.1988), *opinion modified,* 867 F.2d 875 (5th Cir.1989). Thus, the question this court must resolve is whether a Cabaret Royale entertainer's freedom to work when she wants and for whomever she wants reflects economic independence, or whether those freedoms merely mask the economic reality of dependence. *Mednick,* 508 F.2d at 300, 301–02. Indeed, the Fifth Circuit has made it clear that

[a]n employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A., by granting [her] some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have [her] operate.

*Id.* at 303.

41. Defendants exercise control over the entertainers. Cabaret Royale has set show times during which an entertainer may perform. The club also has guidelines describing the way in which an entertainer is to conduct herself while at the club. At the end of an evening, the club deducts twenty percent from each entertainer's credit card tips to cover credit card administrative costs. Additionally, a woman who desires to dance at the Cabaret Royale must sign an independent contractor agreement that is prepared by the club, without any input from the would-be independent contractor.

42. While all of these factors suggest control, the real touchstone is the reality of the employment relationship. *Pilgrim Equipment Co.,* 527 F.2d at 1312. An entertainer at Cabaret Royale is completely dependent on the club for her earnings. The club controls all of the advertising, without which the entertainers could not survive. Moreover, the defendants created and control the atmosphere and surroundings at the Cabaret Royale, the existence of which dictates the flow of customers into the club. An entertainer can be considered an independent contractor only if she "exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Id.* at 1312–13. In this case, the entertainer's economic status is inextricably linked to those conditions over which defendants have complete control.

## B. *Skill and Initiative*

43. Several of the witnesses who testified at trial stated they had no prior experience as topless entertainers before their employment at Cabaret Royale. There was no evidence that any specialized skills were a requirement to perform at the club even though some of the entertainers stated that they had participated in dance lessons. The

court concludes therefore that the entertainers do not require specialized skill in order to perform. *See Circle C.*, above, 998 F.2d at 328.

44. The ability to converse with club clientele in an effort to generate a larger tip is not the type of initiative contemplated by *Silk. See Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1053 (5th Cir.), *cert. denied*, 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987). Customer rapport "much more closely parallels 'efficiency'" than initiative. *Pilgrim Equipment Co.*, above, 527 F.2d at 1314. In *Pilgrim Equipment*, the Fifth Circuit concluded that initiative, not efficiency, is the standard for economic dependence. *Id.*

45. The entertainers at Cabaret Royale do not have the opportunity to exercise the skill and initiative necessary to elevate their status to that of independent contractors. *Cf. Hickey v. Arkla Industries, Inc.*, 699 F.2d 748, 752 (5th Cir.1983). Defendants argue that what a particular entertainer earns in tips is directly related to that entertainer's initiative and skill in performing. This argument, however, is true in any employment relationship: an individual can always improve her chances for greater earnings by using initiative and skill to perform to the best of her ability. *Hickey* accordingly considered initiative, not in the sense of performing well, but in the sense of engaging in those activities that tended to expand the sales representative's client base, goodwill, and contracting possibilities. An entertainer at the Cabaret Royale owns no enterprise. The scope of her initiative is restricted to decisions involving what clothes to wear or how provocatively to dance. Such limited initiative is more consistent with the status of an employee than an independent contractor.

### C. *Investment*

46. Defendants admit that the Cabaret Royale is a truly unique nightclub. Prive spent millions of dollars to assure that the club would stand apart from its competitors. Entertainers at the club make no investment in its facilities or atmosphere aside from choosing what clothing to wear when performing. All investment and risk capital is provided by defendants. Indeed, but for defendants' provision of the lavish work envi-

ronment, the entertainers at the club likely would earn nothing. The unique nature and appeal of the Cabaret Royale confirms, rather than denies, the entertainer's economic dependence. *See Pilgrim Equipment Co.*, above, 527 F.2d at 1313–14.

### D. *Profit and Loss*

47. Cabaret Royale entertainers do not control the key determinants of profit and loss of a successful enterprise. As noted above, the club establishes the hours of operation, sets the atmosphere, and coordinates advertising. Moreover, the minimum charge for a table dance is set by club management with no input from the entertainers. The extent of the risk that entertainers are confronted with is the loss of the "tip out" fee paid each shift. Cabaret Royale, not the entertainers, shoulders the greatest risk of loss. Any profit to the entertainers is more analogous to earned wages than to a return for risk on capital investment. *See Mr. W. Fireworks*, above, 814 F.2d at 1050–51. Accordingly, Cabaret Royale, and not the entertainers, controls the opportunity for profit and loss. *See Circle C.*, above, 998 F.2d at 328.

### E. *Permanency*

48. The facts developed at trial make it clear that the job of dancing is impermanent. However, "in applying the *Silk* factors courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ." *Mr. W. Fireworks*, above, 814 F.2d at 1054 (citing *Mitchell v. John R. Cowley & Bro., Inc.*, 292 F.2d 105, 108 (5th Cir.1961)). Because the entertainers tend to be itinerant, the court must focus on the nature of their dependence. In *Seafood, Inc.*, the Fifth Circuit explained that "[e]ven if the freedom to work for multiple employers may provide something of a safety net, unless a worker possesses specialized and widely-demanded skills, that freedom is hardly the same as true economic independence." 861 F.2d at 452–53. In like manner, this court must consider the economic reality of the employment relationship in determining the weight to be given to the permanence factor.

49. The court rejects defendants' position that the entertainers at the Cabaret Royale are independent contractors. The liberties that defendants have bestowed upon them merely mask economic reality. The totality of circumstances surrounding this employment relationship indicates only economic dependence.

## VI. COMPENSATION OF ENTERTAINERS

■ 50. Topless entertainers at Cabaret Royale receive no compensation from either Prive or Priba. TR 1:126, 143, 172, 193.

51. The entertainers generate their income solely through the tips received from customers in exchange for stage and table dances. *Id.*

52. Entertainers pay Cabaret Royale a "tip out" fee determined by the club. The amount paid has varied from $25.00 to $35.00. The entertainers do not provide Priba with an Internal Revenue Service Form 1099. TR 1:33, 124, 128, 133, 146, 174, 195, 203.

53. Customers can purchase "Cabaret Dollars" from the club by charging their credit cards. Cabaret Royale then issues paper vouchers which club patrons use to procure table and stage dances or to tip the waitresses. TR 1:31; 3:44.

54. When a customer uses "Cabaret Dollars" to pay for a dance, Cabaret Royale deducts 20% of the fee earned. TR 1:31, 126, 145, 173, 193–94.

55. Cabaret Royale reports as gross receipts only 20% of the fee if paid with "Cabaret Dollars." The remaining 80% is recorded as a liability owed the individual entertainer. TR 1:32.

56. Defendants' witnesses differed as to whether Cabaret Royale treated all or only a portion of the sale proceeds of "Cabaret Dollars" as gross receipts. *Compare* TR 1:32 *with* TR 3:44–45.

57. Cabaret Royale keeps no record on the amount of tips earned by an entertainer. TR 1:217; 2:26, 33–37.

58. If the entertainer receives her fee in cash, she keeps the entire amount. No portion of cash receipts is treated as income to Cabaret Royale. TR 1:32.

59. Entertainers charge a minimum of $20.00 for a table dance. TR 1:30, 136, 145, 161, 173. Customers are informed the $20.00 represents the minimum amount charged to have an entertainer perform at the customer's table. The minimum charge is printed on the "Cabaret Dollars," displayed on posters around the club, and announced periodically by the disc jockey. TR 1:204–05; 3:13.

60. Cabaret Royale management has on occasion intervened to collect the table dance charge if a customer refuses to pay. TR 1:161, 205; 3:63.

61. DOL regulations define the term "tip" as follows:

A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. It is to be distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters determined solely by the customer, and generally he has the right to determine who shall be the recipient of his gratuity. In the absence of an agreement to the contrary between the recipient and a third party, a tip becomes the property of the person in recognition of whose service it is presented by the customer.

29 C.F.R. § 531.52 (1993).

62. The DOL has provided additional guidance in determining whether a fee is a tip or wage under the FLSA. "[S]ervice charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the [FLSA]." 29 C.F.R. § 531.55(b) (1993).

63. The fee that an entertainer charges for a table dance is more closely related to a tip than to a wage. The evidence at trial revealed that Cabaret Royale does not treat all of the tips received as gross receipts of the company. *Id; see also Reich v. ABC/ York–Estes Corporation,* 157 F.R.D. 668, 679–80 (N.D.Ill.1994). Entertainers keep 100% of all cash tips received without any accounting to Cabaret Royale. If a patron uses the voucher system to tip the entertainer, Cabaret Royale only credits 20% of the

value of the voucher to gross receipts. The fact that all of the table dance fees are not reported as gross receipts is fatal to Cabaret Royale's claim that the tips are more properly classified as wages. *See ABC/York–Estes Corporation,* above, at 680. Moreover, Cabaret Royale keeps no record of the number of dances performed or the amounts received by the individual dancers.

64. Another factor to evaluate in the classification of a fee as a tip or wage is whether "[t]he amounts received from customers are the employer's property, [and] not [hers]." 29 C.F.R. § 531.55(a). It is clear from the evidence presented at trial that the money entertainers received for performing at Cabaret Royale belonged to them and not to the club. The Agreement that each entertainer signed before dancing at Cabaret Royale clearly states, "Priba shall have no right to any portion of cash sales or tips received." In addition, the Agreement provides that Cabaret Royale will process credit charges and voucher sales for a fee. Thus, both Cabaret Royale and entertainers clearly intended that the tips would belong to the entertainers and that Cabaret Royale would have no ownership interest in the tips but would be entitled only to a processing fee. Accordingly, the fees the entertainers receive for table and stage dances are appropriately classified as tips.

65. Based on the conclusion that the entertainers are employees of Cabaret Royale and that the fees they receive are tips and not wages, the court concludes that Priba has violated § 6(a) of the FLSA, 29 U.S.C. § 206(a), by failing to pay its entertainer-employees the minimum wage required by law. Moreover, Cabaret Royale's practice of collecting a tip out fee similarly violates the FLSA because the deduction further reduces the entertainers' wages below the minimum wage. *See Circle C.,* above, 998 F.2d at 330.

66. To fully compensate the entertainers in the amounts required by the FLSA, Cabaret Royale must pay them the full minimum wage for all time worked during the limitations period. In addition, the club must return all tip out fees collected from the entertainers.

## VII. *COMPENSATION OF WAITRESSES*

67. Cabaret Royale paid its waitresses $2.01 per hour from December 1, 1989 through March 31, 1990 and $2.09 per hour from April 1, 1990 through March 31, 1991. On April 1, 1991, Cabaret Royale increased the waitress' pay to $2.13 per hour plus tips. Pretrial Order ¶ C(7), (8).

68. Waitresses at Cabaret Royale keep 100% of all cash tips. Prive deducts 20% of tips paid by credit card. A significant percentage of tips that the waitresses receive are paid by credit card. TR 1:60, 63, 68–69, 81–82, 94; 2:141, 149; 3:16.

69. None of the waitresses knew the purpose of the 20% deduction. TR 1:64, 76, 89, 116.

70. Besides contributing to the alleged tip pool, the waitresses are required to tip other employees such as bartenders and busboys. TR 1:61, 70, 95, 108.

71. Waitresses average between $100.00 and $150.00 dollars in tips per night. TR 2:141.

72. Cabaret Royale utilizes part of the 20% deduction from charged tips to cover the fees levied by the credit card companies. The remainder is pooled among other tipped employees. TR 2:137; 3:16–18.

73. The FLSA permits an employer to allocate an employee's tips to satisfy up to fifty percent of the statutory minimum wage requirement provided that the following two conditions are satisfied: (1) the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and (2) tipped employees must retain *all the tips* received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m).[2]

74. Cabaret Royale bears the burden of proof, by a preponderance of the evidence, that a valid tip pool agreement

---

**2.** Because the waitresses customarily receive in excess of $30.00 per month in tips, Pretrial Order ¶ C(9), they are considered "tipped employees" under the FLSA. *See* 29 U.S.C. § 203(t).

existed at the club between regularly and customarily tipped employees. *See Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir.1979). In addition, Cabaret Royale bears the burden of proving that the costs levied on the waitresses for credit card processing charges were reasonable. *Cf. Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir.1982) (employer bears burden of proving "reasonable costs" of meals and lodging furnished to employees in lieu of payment of the minimum wage).

75. The evidence presented at trial on this issue fails to satisfy Cabaret Royale's burden of proof. None of the waitresses who testified at trial for either party could state which employees shared in the tip pool. The existence and purpose of the alleged tip pool appeared to be rather elusive even to the employees who funded it. The tipped employees must agree on the distribution of the tipped pool for the pool to be deemed valid. *Barcellona*, above, 597 F.2d at 467. The only testimony offered by Cabaret Royale to prove the legitimacy of the pooling arrangement came from Najjar, the club's general manager. After considering all of the evidence, the court concludes that Cabaret Royale failed to prove, by a preponderance of the evidence, the existence of a valid tip pool arrangement between employees as defined by § 3(m) of the FLSA, 29 U.S.C. § 203(m).

76. The court also concludes that Cabaret Royale failed to satisfy its burden of proving that the deductions from the waitresses tips for credit card processing fees were reasonable. Cabaret Royale presented no documentation or records to support its contention that a percentage of the withholding covered the reasonable costs of credit card processing. Cabaret Royale's arrangement with the waitresses appears to be nothing more than an impermissible shift to its employees of its costs of doing business. The FLSA does not permit an employer to transfer to its employees the responsibility for the expenses of carrying on an enterprise. *See* 29 C.F.R. § 531.3(d)(2) (illustrative list of facilities which primarily benefit the employer); *see also* 29 C.F.R. § 531.32(c) (costs of facilities which primarily benefit the

employer cannot be imposed on employees by being included in computation of wages).

77. Cabaret Royale failed to satisfy the burden imposed by § 3(m) of the FLSA, 29 U.S.C. § 203(m), to demonstrate that "all tips received by such [tipped] employee have been retained by the employee." *See Barcellona*, above, 597 F.2d at 467. Accordingly, Cabaret Royale violated the minimum wage provisions of the FLSA, and the waitresses are entitled to the full minimum wage for each hour worked after December 20, 1989.

## VIII. *UNIFORMS AND COSTUMES*

78. Waitresses who testified for the DOL worked at Cabaret Royale prior to the beginning of the limitations period in this suit. TR 1:62, 73, 86, 114.

79. In response to a DOL inquiry regarding Cabaret Royale's uniform policy, the club changed its practice regarding waitress uniforms. Cabaret Royale discontinued the uniform which consisted of a bustier, tights, and an apron. TR 2:126–27.

80. The cost of the older uniform items ranged in price from $50.00 to $200.00. TR 1:58–59, 67–68, 80, 92, 104.

81. Beginning in March 1991, Cabaret Royale requires all waitresses to wear a uniform which includes the following items: black shoes; black bodysuit; tights; fishnet stockings; and a wide belt. TR 2:127, 142. Cabaret Royale will provide a bodysuit to a waitress for a $60.00 refundable deposit. TR 2:144. If the bodysuit wears out, the waitress may exchange it for a new one without paying a second deposit. TR 2:145.

82. Entertainers must purchase their costumes at their own expense. Agreement (Defendants' Exhibit 1) ¶ 8.

83. Regulations promulgated by the Secretary exclude "the cost of uniforms and of their laundering, where the nature of the business requires the employee to wear a uniform" from the list of facilities which an employer can count as wages to satisfy the minimum wage requirement of the FLSA. *See* 29 C.F.R. § 531.3(d)(1), (2); *see also* 29 C.F.R. § 531.32(c) (employer cannot apply the costs of supplying facilities which primar-

ily benefit the employer to satisfy the minimum wage requirement).

84. The evidence here was undisputed that the Cabaret Royale required the waitresses and entertainers to provide their own uniforms and costumes. This added expense reduced those employees' wages below the minimum wage prescribed by the FLSA.[3] Accordingly, Cabaret Royale must, to comply with the FLSA, reimburse the waitresses and entertainers for the costs incurred in purchasing uniforms and costumes.

## IX. RECORD KEEPING

85. The DOL conducted a wage-hour investigation of Cabaret Royale's records in mid–1989, which is before the beginning of the statute of limitations period on December 20, 1989. TR 2:125.

86. Kay Sheppard, CPA supervises the payroll and accounting functions for Prive and Priba. TR 1:21–22.

87. Cabaret Royale contracts with Automatic Data Processing, Inc. ("ADP") to prepare the payroll for its employees. TR 2:123.

### A. Entertainers

88. The court finds that Priba violated the record keeping requirements of § 11(c) and § 15(a)(5) of the FLSA, 29 U.S.C. §§ 211(c), 215(a)(5), by not making, keeping and preserving payroll or other records containing the information listed in 29 C.F.R. § 516.2 for its employee-entertainers.

### B. Waitresses

89. The evidence at trial established that Prive failed to maintain complete and accurate records as required by § 11(c) of the FLSA, 29 U.S.C. § 211(c). The court finds, however, that these violations were minor. Accordingly, no damages are awarded for this violation, but Prive is enjoined from failing to keep and preserve complete

records in the future. *Dole v. Continental Cuisine, Inc.,* 751 F.Supp. 799, 803 (E.D.Ark. 1990).

90. The DOL is entitled to an injunction restraining Prive and Priba from future violations of the FLSA, including the minimum wage provisions of § 6, 29 U.S.C. § 206, and the record keeping requirements of § 11(c), 29 U.S.C. § 211(c).

## X. DAMAGES

91. The calculation of back wages owed the entertainers and waitresses has proven difficult based on the incomplete evidence presented at trial. *See* Fed.R.Civ.P. 53(b). The computation of damages owed the entertainers is further complicated by lack of records maintained by Cabaret Royale and because the entertainers signed in for work shifts under stage names instead of their legal names. Accordingly, the court hereby refers the issue of the computation of back wages and other compensation owed the employees of Cabaret Royale to a special master for determination. *See Barcellona,* above, 597 F.2d at 466 (affirming in part a decision of the district court which adopted the findings of special master appointed to compute damages in a case arising under the FLSA); *see also* Fed.R.Civ.P. 53(b); Northern District of Texas, Civil Justice Expense and Delay Reduction Plan, at 10 ("The Court encourages the use of special masters consistent with provisions of Fed.R.Civ.P. 53. The presiding judge may appoint a special master on her or his own motion or on the motion of a party.").

92. The special master appointed in this case shall hear evidence on and resolve the following disputed issues relating to damages:

a. The back wages owed the entertainers who were employed by Priba during the relevant limitations period.

3. Cabaret Royale argues that the waitresses and entertainers earned enough in tips during each shift to satisfy the minimum wage requirements of the FLSA and to cover the costs of their outfits. If the Secretary establishes that an employer failed to pay an employee the minimum wage, the burden shifts to the employer to establish that it satisfied the provisions of the FLSA. *Barcellona,* above, 597 F.2d at 467. Cabaret Royale offered no evidence of the amount of tips earned by the entertainers and waitresses and thus failed to carry its burden of proof on this issue.

b. The compensation owed to the entertainers who worked at Cabaret Royale during the limitations period for the all tip out fees that the entertainers paid Cabaret Royale.

c. The back wages owed to waitresses who worked at Cabaret Royale during the limitations period.

d. The costs incurred by the waitresses and entertainers for uniform and costume purchases during the limitations period.

93. The court will defer a determination of the amount of back wages and other compensation that Cabaret Royale owes the entertainers and waitresses until the special master submits a final report pursuant to Fed.R.Civ.P. Rule 53(e).

94. Within ten (10) days of the date of this order, the parties shall confer for the purpose of selecting a special master. The parties shall then report to the court in writing, within fifteen (15) days of the date of this order, the results of their conference. If the parties cannot reach agreement on a suitable person to act as special master, each party shall submit to the court a list of three (3) candidates, including a statement of the qualifications of each person proposed.

### XI.  *CONCLUSION*

95. The DOL shall prepare and submit to the court, on or before April 17, 1995, a proposed form of judgment, which conforms to the findings of fact and conclusions of law contained in this memorandum of decision, on the liability issues in this case.

SO ORDERED.