Eric MYERS, Jimmy Underwood,
Michelle Grundorf, et al.,
Plaintiffs–Appellants,

v.

THE COPPER CELLAR CORPO-
RATION, Defendant–Appellee.

No. 98–5595.

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1999.

Decided Sept. 3, 1999.

Justin M. Schwamm, Sr. (briefed), Knoxville, TN, Helen de Haven (argued and briefed), Grundy, VA, for Plaintiffs–Appellants.

**548**

Dudley W. Taylor (argued and briefed), Taylor Law Firm, Knoxville, TN, David H. Jones, Scott & Jones, Sevierville, TN, for Defendant–Appellee.

Before: KRUPANSKY, RYAN, and SUHRHEINRICH, Circuit Judges.

KRUPANSKY, Circuit Judge.

The three named plaintiffs-appellants, Eric Myers, Jimmy Underwood, and Michelle Grundorf, joined by twenty-seven similarly situated "opt-in" plaintiffs,[1] initiated a complaint under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201–219 ("the FLSA"), on September 29, 1995 (amended January 17, 1997), against defendant The Copper Cellar Corporation ("Copper Cellar"), the owner and operator of approximately ten steak and seafood restaurants in the Knoxville, Tennessee area, for alleged unpaid statutory minimum wages, liquidated damages, damages for alleged retaliation and intimidation, sanctions for alleged misconduct, and attorney fees. Each plaintiff had been employed in a Copper Cellar restaurant as a tipped wait staff employee during some part, or all, of the period September 29, 1992 through September 29, 1995. On review, the plaintiffs have challenged an adverse judgment entered by a United States Magistrate Judge following a bench trial authorized by 28 U.S.C. § 636(c) and FED.R.CIV.P. 73.

During the subject three year span, Copper Cellar's corporate standard operating procedures dictated that the table server must prepare a house salad for each of his or her customers.[2] The waiter or waitress would draw ingredients from storage bowls which had been stocked by the kitchen staff, mix them in a standard salad bowl, add the customer-specified dressing, and deliver it to the patron. However, during various peak volume seasons, days, or hours, management at some Copper Cellar restaurants would occasionally designate a single wait staff employee exclusively to prepare house salads for all table servers then on duty. During such "salad shifts," the assigned salad maker typically performed no substantial duties other than the assembly of house salads and associated tasks, such as the maintenance of the salad preparation area and the restocking of depleted salad ingredients obtained from the galley. The salad preparer had no personal contact with diners, labored outside their view, and received no direct customer gratuities.

Nonetheless, because the defendant considered the salad preparers to perform a wait staff function, it compelled the inclusion of the salad maker within the shift's "tip pool." Generally, Copper Cellar required each of its directly tipped service employees to contribute a portion of his or her gratuities (generally an amount equal to 2% or 3% of the server's total gross sales, although the practice varied among the defendant's restaurants) earned during the shift to a fund to be divided among the employees who had assisted the servers, including bus boys, runners, service bartenders, and (if one was on duty) the salad maker. In turn, the employer compensated personnel who shared in customer largess at a rate equal to approximately 50% of the $4.25 per hour prevailing statutory minimum wage (to wit, $2.13 per hour), claiming for itself the "tip credit" against the minimum wage obligation authorized by 29 U.S.C. § 203(m).[3] The defendant

---

1. Ronnie Allen, Lenore Arcera, Steve Caudill, Rodney Lee Crowder, Lorraine Fuller, Brenda Gaps, Staci Grant, Treasa Green, Karen Hernandez, Emily Holt, Carol Kitchens, Gary Lee, Carol Marmorek, Richard Metzelder, Christa Owen, Rodney Phillips, Dana Randolph, Sheryl Reagan, Tim Rowan, Andrew Smith, Daniel Smith, Matthew Smith, Shaun Thomas, Brandon Walker, John Walker, Mandy Weldon, and Ramon Williams. *See* 29 U.S.C. § 216(b).

2. By contrast, a specialty salad, such as a Caesar salad, would be created by kitchen employees.

3. The governing statute, which defined "wage" for FLSA purposes, provided, at all times pertinent to the instant litigation, that:

has endeavored to justify its classification of the salad assemblers as properly "tipped" service employees by reason of their performance of a task which each individual server otherwise would have been required to discharge, thereby enhancing the efficiency of customer service and concurrently increasing the total number of tables which a server could tend, which, in tandem, escalated the server's potential perquisite earnings during the subject shift.[4] *See* 29 C.F.R. § 531.54 (recognizing that bus boys who assist servers but who customarily do not directly receive diner-donated gratuities may properly be included in an employer-mandated tip pool).[5]

In opposition, the plaintiffs have contended that the salad makers were not qualified "tipped employees" because they performed exclusively behind-the-scenes food preparation, rather than true customer service, functions. *See* 29 C.F.R. § 531.56(e) (illustrating that an employee who discharges distinct duties on diverse work shifts may qualify as a tipped employee during one shift, such as one in which he or she serves tables, but might not qualify as a tipped employee on another shift, for example, one during which he or she performs maintenance tasks). According to the plaintiffs, the defendant's inclusion of salad preparers within a shift's tip pool invalidated its claimed statutory tip attribution against its minimum wage obligations towards the affected workers on that shift; hence, the defendant owes accrued wages equal to $2.12 to each plaintiff for each hour worked between September 29, 1992 and September 29, 1995 dur-

---

4. In determining the wage obligation of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of ... 50 percent of the applicable minimum wage rate after March 31, 1991, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee. The previous sentence shall not apply with respect to any tipped employee unless (1) such employee has been informed by the employer of the provisions of this subsection, and (2) all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips. 29 U.S.C. § 203(m) (as amended Nov. 17, 1989). *See Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 298 (6th Cir. 1998). Section 203(m) has been materially amended effective August 20, 1996. Pub.L. 104–188, § 2105(b).

At all times relevant to the case at bench, the statutory basic minimum wage was $4.25 per hour. 29 U.S.C. § 206(a)(1) (as amended Nov. 17, 1989). Accordingly, an employer was authorized to compensate its tipped staffers at one-half of minimum wage (or $2.125 per hour), contingent upon satisfaction of other statutory requisites.

A "tipped employee" is "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). No controversy existed in the instant trial record that each plaintiff fulfilled the $30 per month requirement. However, the proper inclusion of the salad makers within a section 203(m) compulsory tip sharing fund is also contingent upon the substantiated characterization of their employment as a "service" vocation of a type which has traditionally received customer gratuities. *Kilgore*, 160 F.3d at 300–02 (*citing, inter alia*, 29 U.S.C. §§ 203(m) & (t)).

5. Because Congress designed the FLSA to remedy disparities in bargaining power favorable to employers, the courts narrowly construe the provisions of that statutory scheme, including its exemptions, in the employee's favor. Accordingly, an employer who invokes a statutory exemption from minimum wage liability bears the burden of proving its qualification for that exemption. *Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Douglas v. Argo–Tech Corp.*, 113 F.3d 67, 70 (6th Cir.1997); *Salyer v. Ohio Bureau of Workers' Compensation*, 83 F.3d 784, 786 (6th Cir.), *cert. denied*, 519 U.S. 964, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996).

Although the Labor Department's wage and hour regulations, as administrative interpretations of the FLSA, "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," the Regulations have recognized that "[t]he ultimate decisions on interpretations of the Act are made by the courts." 29 C.F.R. § 531.25(a) (citations omitted).

ing any shift which included a scheduled salad maker. The district court agreed, finding that, because the salad maker's duties more closely resembled those of non-tipped kitchen staff than tipped table service personnel, they could not legitimately be incorporated into a section 203(m) tip pool.

This circuit recently affirmed a magistrate judge's summary judgment ruling that hosts and hostesses at Outback steak houses qualified as "tipped employees," and thus were legitimately subsumed into a section 203(m) tip pool, because they worked in a customarily "tipped" service occupation. *Kilgore v. Outback Steakhouse of Florida, Inc.,* 160 F.3d 294, 300–02 (6th Cir.1998). On appellate review, this court concluded that, as a factual matter, the actual employment functions of the Outback hosts/hostesses entailed sufficient customer interaction and table attendance duties to qualify their job classification as among the types which have traditionally generated service gratuities.[6] The *Kilgore* court explained:

> Hosts at Outback are "engaged in an occupation in which they customarily and regularly receive tips" because they sufficiently interact with customers in an industry (restaurant) where undesignated tips are common. Although the parties dispute exactly how hosts spend their time working at Outback, hosts do perform important customer service functions: they greet customers, supply them with menus, seat them at tables, and occasionally "enhance the wait." Like bus persons, who are explicitly

mentioned in 29 C.F.R. § 531.54 as an example of restaurant employees who may receive tips from tip outs by servers, hosts are not the primary customer contact but they do have more than de minimis interaction with the customers. One can distinguish hosts from restaurant employees like dishwashers, cooks, or off-hour employees like an overnight janitor who do not directly relate with customers at all. Additionally, the fact that Outback prohibits hosts from receiving tips directly from customers provides some evidence that Outback hosts work in an occupation that customarily and regularly receives tips.

*Id.* at 301–02 (brackets and ellipses omitted; quotations in original).

■ In the case *sub judice,* the magistrate judge's post-trial finding that Copper Cellar's salad makers did not engage in a customarily "tipped" occupation was not clearly erroneous.[7] FED.R.CIV.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Kline v. Tennessee Valley Authority,* 128 F.3d 337, 341 (6th Cir.1997). Indeed, on the instant record, a contrary finding would have constituted clear error in light of *Kilgore.* Because the salad preparers abstained from any direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work, they could not be validly categorized as "tipped employees" under section 203(m). Accordingly, during

6. The *Kilgore* decision compared and contrasted the professional roles of table servers and hosts/hostesses as follows:

> Servers at Outback perform the traditional tasks of waiters and waitresses. They take orders, deliver food and drinks, and take care of other customer demands. Hosts primarily greet customers, pass out menus, and seat the customers. Hosts also take carry-out orders by phone and transfer carry-out information to the bar where the customer picks up her order, clear dirty dishes from tables although this is primarily the responsibility of the bus staff, fill cus-

> tomers' water glasses, "enhance the wait" by providing complementary appetizers or drinks to customers who are waiting for a table (Outback does not take reservations, so the wait can be substantial), and take appetizer orders to customers.

*Kilgore,* 160 F.3d at 296.

7. Whereas, on review, the lower court's factual determinations are examined for clear error, its legal conclusions are reconsidered *de novo. Kline v. Tennessee Valley Authority,* 128 F.3d 337, 341 (6th Cir.1997).

the work shifts in which salad mixers were included within the tip pool, the pooling scheme was illegal; thus each employee who was compelled to contribute to such a tip pool was statutorily entitled to payment of the full $4.25 per hour minimum wage for all work time logged during those shifts. 29 U.S.C. § 203(m); *Kilgore,* 160 F.3d at 302.

■ Nonetheless, an FLSA plaintiff must prove by a preponderance of evidence that he or she "performed work for which he [or she] was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Often, the plaintiff can prove his or her "under-compensation" damages through discovery and analysis of the employer's code-mandated records.[8] *Id.* at 687, 66 S.Ct. 1187. However, if the employer kept inaccurate or inadequate records, the plaintiff's burden of proof is relaxed,[9] and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's in-

ferential damage estimate. *Id.* at 687–88, 66 S.Ct. 1187.

■ In the subject cause, the magistrate concluded that each plaintiff failed to prove his or her damages caused by the employer's invalid tip redistribution regime. The plaintiffs had merely invoked payroll records produced by the defendant which reflected the total number of hours clocked by each employee on a given work day, but which failed to disclose the precise hours of the day or the shift worked by any employee; coupled with imprecise testimony from several plaintiffs which evinced that certain Copper Cellar restaurants tended to schedule salad assemblers during certain high-traffic hours, days, or seasons. However, the defendant possessed precise records from which the plaintiffs could have conclusively reconstructed the definite days and hours during which each plaintiff worked during a designated "salad shift."[10] Because the plaintiffs failed to carry their burden of proving damages with specificity by the

8. The FLSA directs, in material segment:

> Every employer subject to any provision of this chapter ... shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time ... as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations ... thereunder.

29 U.S.C. § 211(c). *See also* 29 C.F.R. §§ 516.1, 516.2, 516.5, 516.6, & 516.28.

9. The Supreme Court has dictated:

> But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.... In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The bur-

den then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (citation omitted). *See also Herman v. Palo Group Foster Home, Inc.,* 183 F.3d 468, 471–73 (6th Cir.1999); *United States Department of Labor v. Cole Enterprises, Inc.,* 62 F.3d 775, 779 & n. 2 (6th Cir.1995).

10. During discovery, the defendant produced a complete listing of the specific days and approximate hours of all salad shifts scheduled at each of its restaurants during the three year period in controversy. It also maintained all employee time cards generated during that period, which reflected the specific days and hours worked by each employee. A comparative analysis of that collective data could have produced an accurate account of the salad shifts actually worked by each employee. However, the plaintiffs neglected to request production of the employee time cards.

use of available employment records, the option to prove their damages inferentially, which arises only when the employer has neglected to create or preserve accurate or complete records, was unavailable to them. *See id.*

■■■ A careful review of the record revealed that no clear error of fact, or misapprehension or misapplication of law, infected the magistrate's finding that the plaintiffs' failure of proof of damages fatally subverted their claim for unpaid minimum wages earned during salad shifts.[11] Additionally, because the plaintiffs have proved no actual damages, their dependent claim for statutory liquidated damages is moot.[12] 29 U.S.C. § 216(b); *Dole v. Elliott Travel & Tours,* 942 F.2d 962, 967 (6th Cir.1991).

■■■ Next, the plaintiffs have asserted that the defendant has forfeited its entitlement to a tip credit for any of their work hours, and thus it should have paid them the full minimum wage of $4.25 per hour for *all* time clocked during the three year term in controversy, because it habitually deducted a three percent (3%) service charge from each employee gratuity which a customer had charged via a credit card or similar instrument, in purported violation of § 203(m)'s command that a tipped employee must be permitted to retain all gratuities received by that employee, excepting tips shared in a pooling arrangement.

At all relevant times, Copper Cellar restaurants accepted credit cards issued by American Express, Visa, Mastercard, Discover, and Diner's Club, for any customer purchase(s). In turn, each credit card company charged the payee (Copper Cel-

lar) a service fee (sometimes called the "discount rate"), which equaled a designated percentage of the total amount posted to the diner's credit account payable to Copper Cellar. Those percentages varied in accordance with the type of credit card used by the customer, the periodic renegotiation of processing terms between the defendant and the specific credit supplier, and other variables. In all instances, because the financial institution computed its settlement charge assessed against the payee with reference to the total amount debited by the payer in the payee's favor; a restaurant patron's addition of a service gratuity to his charged tab would proportionately increase the total service cost billed to the payee/restaurant. Each credit supplier deducted its full handling fee from the credit extended to the payer/customer prior to its surrender of that revenue to the payee/restaurant in discharge of the client's gastronomical indebtedness.

Prior to 1979, Copper Cellar, as a matter of corporate policy and practice, always assumed the full service cost associated with the resolution of all charged customer debts, including any portion attributed to service tips; an employee who was the intended beneficiary of a charged gratuity was permitted, at the shift's end, to immediately withdraw the full currency equivalent of that tip's face value from the restaurant's cash receipts.

However, since 1979, the defendant has deducted, at each shift's end, a fixed standard percentage from the money which it advanced to the employee in satisfaction of any charged perquisite, as reimbursement for the defendant's expenses incurred in ultimately collecting the tip from the cred-

---

11. Of course, the magistrate's assessments of the credibility of witness testimony pertinent to the "salad shift" issue, or any other testimony, was not subject to appellate re-evaluation. *Anderson v. City of Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *United States v. Gessa,* 57 F.3d 493, 496 (6th Cir.1995).

12. Similarly, because the plaintiffs have recovered no damages, their contention that the defendants' FLSA violations were "willful," which, if proved, would extend the limitations period from two to three years, is also moot. *See* 29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 135, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *Herman v. Palo Group Foster Home, Inc.,* 183 F.3d 468, 473–74 (6th Cir.1999).

it-extending institution. Copper Cellar periodically computed a composite withholding percentage, based upon the discount rates contemporaneously exacted by the various implicated financial service providers and other cost factors, which, on average, roughly compensated it for its overall expenditures made during a defined period in connection with liquidating charged tips for its employees. However, because the defendant deducted the *same* standard composite percentage from each credit card tip irrespective of the actual discount rate imposed on a particular transaction by the specific credit service provider, the defendant's service charge deduction sometimes slightly exceeded, but on other occasions fell short of, the financial institution's actual processing fee levied for the subject charged tip.

By reason of the defendant's successful negotiation, over time, of progressively more advantageous credit servicing terms, coupled with other favorable economic factors, the defendant's standard composite deduction rate declined from 4% in 1991 to only 2% by the time of trial in July 1997. During the three year period at issue, Copper Cellar had instituted a 3% standard composite deduction rate from its employees' charge card tips.[13]

The plaintiffs have contended that the withholding of any amount of employee tips, including funds necessary to compensate the customer's credit device issuer for its financial services rendered on account of charged tips, violated the proviso of 29 U.S.C. § 203 that, with the exception of tip pooling, "all tips received by such employee [must] have been retained by the employee." *See* note 3 above.

▬ Although no controlling judicial precedent has addressed the joined question, it is clear that, as a matter of law, an employer may subtract a sum from an employee's charged gratuity which reasonably compensates it for its outlays sustained in clearing that tip, without surrendering its section 203(m) partial set-off against minimum wages. Whereas Congress intended that, with the exception of tip pooling, a tipped employee must be permitted to retain *all* of his or her gratuities as a prerequisite to the employer's invocation of the statutory tip credit, 29 U.S.C. § 203(m), Congress patently did *not* intend that the tipped employee should ever receive *more* than that amount. Before an employee can be entitled to attain any funds on account of a charged customer gratuity, that debited obligation must be converted into cash. The liquidation of

**13.** The trial record reflected that, for domestic personal use credit cards, American Express retained 2.9% from 1992 through April 1994, and 3.25 % thereafter until September 1995; Diner's Club billed 2.9% throughout the entire period in controversy; Discover discounted 2.9% from 1995 until April 1994, when it lowered its rate to 1.91% until at least September 1995; Mastercard deducted 1.79% from 1992 until November 1993, when it reduced its charge to 1.69% for the balance of the pertinent period; and Visa extracted 1.79% from 1992 until November 1993, 1.62% between November 1993 and April 1994, and 1.63% thereafter until September 1995. Additionally, business or corporate charge cards carried discount rates typically one percentage point higher than the domestic personal card rate, and foreign credit cards generally imposed relatively high servicing fares.

Moreover, Copper Cellar withheld no credit collection cost recovery from server gratuities bestowed by the customer's usage of a Copper Cellar gift certificate. Because Copper Cellar sold a quantity of gift certificates worth approximately $750,000 per annum during the subject three years, most of which were purchased by use of credit devices, that benefit to the tipped employees was substantial. Furthermore, because the defendant authorized its tipped staffers to *immediately* withdraw, at the close of a shift, the cash equivalent of their credit card tips minus the 3% handling fee, it absorbed all losses caused by charged customer obligations (including any attendant credited gratuities) which, for whatever reason, ultimately were not collectable. In all events, the defendant's immediate cash-out policy provided its tipped employees with immediate access to charged gratuity funds, which concomitantly deprived the defendant of the beneficial use of those advanced funds, and accrued interest thereon, during the interim settlement period.

the restaurant patron's paper debt to the table server required the predicate payment of a handling fee to the credit card issuer.

Accordingly, the employee could only have been entitled to receive the cash proceeds of the charged tip *net of liquidation expenses*. Nothing in the FLSA evidenced a Congressional intent to compel employers to contribute anything to any customer's tip, including any funds required to "cash out" a charged tip for the benefit of the employee. *See* 29 C.F.R. § 531.52 (defining a "tip" to consist, *inter alia*, of money gifted *by a customer* in recognition of service which is received by the employee free of any control by the employer); § 531.53 (explaining that tips may include "amounts transferred by the employer to the employee pursuant to directions from credit customers who designate amounts to be added to their bills as tips."). Reading sections 531.52 and 531.53 together, it is clear that a charged gratuity becomes a "tip" only after the employer has liquidated it and transferred the proceeds to the tipped employee; prior to that transfer, the employer has an obvious legal right to deduct the cost of converting the credited tip to cash.

Despite the dearth of pertinent judicial authority, the Department of Labor has long construed the FLSA to permit the employer's reduction of an employee's charged tip by the amount of a service toll associated with settlement of that debited perquisite. Its official field manual posits:

> Where tips are charged on credit cards, WH [the Wage and Hour Division] will not question the reduction of the credit card tips paid over to the employee if the amount deducted is no greater than the percentage charged by the credit card company. For example, where a credit card company charges an employ-
> er 5 percent on all sales charged to its credit service, the employer may pay the employee 95 percent of the tips without violating FLSA.

U.S. DEPT. OF LABOR FIELD OPERATIONS HANDBOOK § 30d05(a) (Dec. 9, 1988). The Labor Department initially promulgated that interpretation of the FLSA in 1977, via a Wage and Hour Opinion Letter, 99 WHM 1254 (Opinion WH—410) (March 28, 1977). Although those administrative pronouncements do not bind the courts, they nonetheless provided some persuasive authority, issued by the government agency responsible for enforcement of the federal wage and hour laws,[14] that the FLSA should not be read to force a service industry employer to elect between either (1) liquidating employee tips at its own expense, or (2) sacrificing its statutory tip offset against minimum wages if it subtracts the tip collection fee from the employee's gratuity.

However, this forum rejects the proposition that, to avoid invalidation of the tip credit, an employer's deduction from an employee's credit card tip may not, under any circumstances, exceed the actual service charge imposed by the credit service provider with respect to the specific charged gratuity at issue. To the contrary, this court concludes that the employer may, consistent with the letter and spirit of the FLSA, withhold a standard composite percentage from each credit card tip, even if, as a consequence, some deductions will exceed the expense actually incurred in collecting the subject gratuity, *as long as* the employer proves by a preponderance of evidence that, *in the aggregate*, the amounts collected from its employees, over a definable time period, have reasonably reimbursed it for no more than its total expenditures associated with credit card tip collections.[15] Stated differently,

14. *See* 29 C.F.R. § 531.25(a); *Kilgore*, 160 F.3d at 302–03; *Brock v. Louvers and Dampers, Inc.*, 817 F.2d 1255, 1257–58 (6th Cir. 1987).

15. At least one reported out-of-circuit district court adjudication has, by implication, so mandated. In *Reich v. Priba Corp.*, 890 F.Supp. 586 (N.D.Tex.1995), the district judge posited, following a bench trial, that the em-

the employer must prove that its total deductions from employees' tip incomes did not enrich it, but instead, at most, merely restored it to the approximate financial posture it would have occupied if it had not undertaken to collect credit card tips for its employees during the relevant period.[16] *See Herman v. Collis Foods, Inc.*, 176 F.3d 912, 918 (1999) (recognizing "the FLSA's policy of preventing employers from exploiting § 203(m) deductions for profit.").

This circuit has recently defined that the "reasonable cost" of an employer-provided meal, which, pursuant to section 203(m), the employer may deduct from the employee's pay check as a credit against its minimum wage obligation,[17] may consist of a standardized substantiated estimated average cost, rather than the actual cost, of such customarily furnished meals, which the employer may subtract automatically on a "per-shift" basis, even if the employee

declines that repast.[18] *Id.* at 916–18. While the question posed before the instant forum is not whether an employer may deduct the reasonable cost of processing an employee's credit card tip from his or her minimum wages, but instead is whether the employer may subtract those reasonable expenses from the employee's non-wage tip income, *Collis Foods* furnishes analogical support for the conclusion that Congress intended, via section 203(m), to permit an employer, at least in some instances, to credit itself with the average, instead of the actual, expense incurred in providing a valuable service or commodity to its employees.

Additionally, an employer's extraction from each charged employee tip of a fixed composite percentage handling fee, which reasonably reimburses it in the aggregate for its total expenditures related to processing its employees' total credit card

ployer had, failed to prove that its standard 20% deduction from its waitresses' credit card tips (*see id.* at 595) was reasonably compensatory. The trial bench stated:

> The court also concludes that Cabaret Royale failed to satisfy its burden of proving that the deductions from the waitresses tips for credit card processing fees were reasonable. Cabaret Royale presented no documentation or records to support its contention that a percentage of the withholding covered the reasonable costs of credit card processing. Cabaret Royale's arrangement with the waitresses appears to be nothing more than an impermissible shift to its employees of its costs of doing business. The FLSA does not permit an employer to transfer to its employees the responsibility for the expenses of carrying on an enterprise.

*Id.* at 596 (citations omitted). Accordingly, proof that the employer's standard deduction from its employees' credit card tips reasonably compensated it *only* for no more than the overall costs of processing credit card tips, rather than other costs of doing business, would have safeguarded the employer's statutory tip credit. Although the *Priba Corp.* precedent does not bind this review, it nonetheless was supported by persuasive logic.

16. Of course, the adoption of a system whereby the employer deducts no more than the actual processing tariff assessed by the credit service provider on each individual charged

gratuity would be, as a matter of law, *per se* reasonable.

17. The FLSA directs:

> " 'Wage' paid to any employee includes the reasonable cost ... to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees[.]"

29 U.S.C. § 203(m).

18. Even when an employee consumes employer-provided food, the employer may charge the substantiated estimated average cost of a customarily provided meal, instead of the actual cost of the food consumed by the employee on a specific occasion, against that employee's compensation. For example, a restaurant which offers food to its workers as a component of the compensation package may deduct a standard substantiated estimated average amount from each employee's wages for customarily provided food during each shift worked, irrespective of the amount, type, or value of the cuisine actually eaten by the employee. *Herman v. Collis Foods, Inc.*, 176 F.3d 912, 918 (6th Cir.1999). The same administrative efficiency and convenience considerations which might motivate such a corporate policy and/or practice also buttress Copper Cellar's utilization of a standard composite percentage deduction from each credit card tip.

tips, may be analogized to a Congressionally-sanctioned tip pool. *See* 29 U.S.C. § 203(m). In effect, the employees have pooled the collective expense of liquidating their credit card tips by surrendering to the employer a consistent fixed percentage of their charged gratuities which, in sum, refunded the employer's expenditures reasonably incurred in providing the tip-settlement service, even though, on occasion, the amount withheld by the employer on a specific account may exceed, by a few cents, the actual cost of clearing that particular tip. In exchange, the overall substantial benefits of Copper Cellar's policies and practices related to charged tips inure to each participating tipped employee. *See* note 13 above.

A painstaking review of the record evidence disclosed no clear error in the initial forum's finding that Copper Cellar's 3% standard composite deduction from its employees' credit card tips between September 29, 1992 and September 29, 1995 was reasonably compensatory. *See Collis Foods,* 176 F.3d at 919. Accordingly, that practice did not divest the defendant of its statutory tip credit. 29 U.S.C. § 203(m). Additionally, this review has identified no clear factual error, abuse of discretion, or mistake of law in the lower court's disallowance of claimed damages for alleged retaliation and/or intimidation under 29 U.S.C. § 215(a)(3), or in its rejection of the plaintiffs' request for sanctions.

Having carefully considered the entire record, the governing law, and all arguments of counsel, this court concludes that each of the plaintiffs' assignments of error was misconceived. Accordingly, the judgment of the district court is **AFFIRMED**.